[No. B183974. Second Dist., Div. Three. Feb. 28, 2007.]

FREMONT INDEMNITY COMPANY, Plaintiff and Appellant, v. FREMONT GENERAL CORPORATION et al., Defendants and Respondents.

COUNSEL

Bill Lockyer, Attorney General, W. Dean Freeman, Mark P. Richelson and Raymond B. Jue, Deputy Attorneys General; Orrick, Herrington & Sutcliffe, Thomas J. Welsh, James E. Houpt and Jonathan G. Riddell for Plaintiff and Appellant.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub, Iain A. W. Nasatir, James K. T. Hunter; Kaye Scholer, George T. Caplan, Kristopher S. Davis and Matthew G. Clark for Defendants and Respondents.

OPINION

**CROSKEY, Acting P. J.**—Fremont Indemnity Company (Indemnity) appeals a judgment dismissing its complaint against Fremont General Corporation (Fremont General) and Fremont Compensation Insurance Group, Inc. (Insurance Group), after the court sustained a demurrer without leave to amend. Indemnity, by and through the Insurance Commissioner as its liquidator, sued Fremont General and Insurance Group in two separate actions alleging the misappropriation of funds. In this action, known as the Comstock action, Indemnity alleges that defendants misappropriated net operating losses of its predecessor in interest, Comstock Insurance Company (Comstock), and misappropriated other assets of a former subsidiary of Indemnity, Fremont Reinsurance Company, Ltd. (Bermuda) (Re). In a separate action, known as the NOL (net operating loss) action, Indemnity alleges that the same defendants misappropriated Indemnity's net operating losses that were not acquired through its merger with Comstock. The NOL action is the subject of a separate appeal (*Fremont Indemnity Co. v. Fremont General Corp.* (Feb. 28, 2007) B188900 [nonpub. opn.]).

█ The superior court took judicial notice of a letter agreement dated July 2, 2002, and determined that the agreement allowed Fremont General to use the net operating losses in the manner alleged. The court also concluded that the complaint alleged counts on behalf of Re and against Re, which is not a party to this action. Indemnity contends the court erred by taking judicial notice of not only the existence of the letter agreement but also its enforceability and proper interpretation. Indemnity also challenges the sustaining of the demurrer on other grounds. We conclude that the court erred by taking judicial notice of the enforceability and proper interpretation of the letter agreement and by deciding those questions in ruling on the demurrer. We also conclude that the complaint alleges facts sufficient to constitute a cause of action for the conversion of intangible personal property. We conclude further that the sustaining of the demurrer cannot be affirmed on

other grounds, with the sole exception of count eleven for violation of Insurance Code section 1215.5, which fails to state a proper cause of action. Accordingly, we reverse the judgment with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background

Indemnity is a wholly owned subsidiary of Insurance Group, which is a wholly owned subsidiary of Fremont General. Indemnity was engaged in the underwriting and sale of workers' compensation insurance. Comstock was a wholly owned subsidiary of Insurance Group until March 2003, when Comstock was merged into Indemnity. Comstock was engaged in the underwriting and sale of multiple lines of property and casualty insurance before 1986, and at that time ceased issuing new or renewal policies and limited its business to its preexisting policies. Re was a wholly owned subsidiary of Indemnity until September 2000, when Re was acquired by Insurance Group.

Fremont General, Insurance Group, and Indemnity entered into an agreement that was memorialized by a letter dated November 27, 2000, providing for the commissioner to supervise and provide regulatory oversight of Indemnity. The same parties, in the words of the complaint, "purported to enter into a second agreement, allegedly memorialized by a letter dated July 2, 2002," on the same subject.

Comstock was merged into Indemnity in March 2003, as we have stated. The commissioner filed an application to be appointed conservator of Indemnity on June 3, 2003. The court appointed the commissioner as conservator on June 4, 2003, and appointed the commissioner as liquidator on July 2, 2003.

### 2. Complaint

Indemnity, by and through the commissioner, filed a complaint against Fremont General and Insurance Group in August 2004. Indemnity alleges that Fremont General dominated and controlled each of the insurance company subsidiaries and did so in a manner that benefited Insurance Group at the expense of Indemnity. Specifically, Indemnity alleges the following facts.

Fremont General and Comstock entered into an intercompany tax allocation agreement in October 1996 providing for the two companies to file a consolidated federal income tax return. The agreement provided that within three years after filing a consolidated tax return, Fremont General would pay Comstock for benefits that Fremont General received from claiming

Comstock's net operating losses in the return.[1] Comstock's net operating losses exceeded $52 million as of December 31, 2002. Fremont General caused Comstock to be merged into Indemnity in March 2003, resulting in Indemnity's acquisition of all the assets and liabilities of Comstock. Indemnity alleges that both before and after the merger, Fremont General appropriated Comstock's net operating losses by various means, reducing its own tax liability, without compensating either Comstock or Indemnity and that Indemnity suffered damage as a result.

Indemnity also alleges that Fremont General caused Re to transfer more than $19 million in assets to Insurance Group in December 1996 in exchange for an unsecured promissory note, caused Re to allow Insurance Group to defer payment of over $1.9 million due on the note, and caused Re to invest over $7.5 million in Fremont General in December 1999 and May 2000. Indemnity alleges that Fremont General caused Insurance Group to purchase Re from Indemnity in September 2000 for $6,819,912, which was less than fair value, and then caused Re to declare a dividend, the value of which exceeded the purchase price.

Indemnity alleges further that Fremont General caused Comstock to assume certain liabilities of Re to the benefit of Insurance Group, as Re's parent company after September 2000, and to the detriment of Indemnity, which later merged with Comstock. The liabilities included reinsurance policy obligations that formerly were shared by both companies but were transferred to Comstock, and a series of settlements on reinsurance policies, known as commutations, for which both companies were liable but that were paid by Comstock alone. Indemnity alleges that Re recorded accounts payable for its share of the commutations but failed to repay Comstock in full either before or after the merger.

Indemnity alleges counts for (1) declaratory relief, seeking a declaration that Fremont General by various means appropriated Comstock's net operating losses without adequate compensation; (2) a permanent injunction under Insurance Code section 1020, to cause Fremont General to file an amended consolidated federal income tax return for 2002 in which Fremont General would not misappropriate Comstock's net operating losses, to prevent further interference with Comstock's net operating losses, and to order Fremont General to pay compensation for the economic benefit received from its prior use of Comstock's net operating losses; (3) breach of contract, alleging the failure to pay amounts due under the intercompany tax allocation agreement; (4) breach of fiduciary duty; (5) unjust enrichment; (6) constructive trust; (7) conversion; (8) avoidance of fraudulent transfers under the Uniform

---

[1] By carrying over or carrying forward a net operating loss, a taxpayer can reduce its taxable income in a given year. (26 U.S.C. § 172.)

Fraudulent Transfer Act (Civ. Code, § 3439 et seq.); (9) avoidance of voidable preferences under Insurance Code section 1034; (10) avoidance of fraudulent transfers under Insurance Code section 1034.1; (11) recovery of misappropriated funds under Insurance Code section 1215.5, part of the Insurance Holding Company System Regulatory Act (Ins. Code, § 1215 et seq.); and (12) recovery of impermissible distributions under Insurance Code section 1215.16, which is part of the same act.

The first two counts are alleged against Fremont General only, while counts three through twelve are alleged against both Fremont General and Insurance Group. The first three counts pertain to only the alleged misappropriation of Comstock's net operating losses, while counts four through twelve pertain to that and also to the alleged misappropriation of assets involving Re.

Indemnity alleges similar theories of recovery against Fremont General and Insurance Group in the NOL action arising from the alleged misappropriation of Indemnity's net operating losses that were not acquired through its merger with Comstock. In its first amended complaint in the NOL action filed in July 2004, Indemnity also alleges that the letter agreement dated July 2, 2002, did not relieve Fremont General of its obligation to pay fair and reasonable consideration for use of Indemnity's net operating losses and alleges that to the extent the letter may be construed differently, the defendants obtained the commissioner's consent to those terms by fraudulently concealing Indemnity's precarious financial condition.

### 3. *Demurrer*

Fremont General and Insurance Group demurred to the complaint and each count alleged. They requested judicial notice of a letter dated July 2, 2002, and other documents. They cited no statutory authority for judicial notice, but argued that the court previously had taken judicial notice of the same letter in the NOL action and that reference to the document was essential to an understanding of the facts alleged in the complaint. The letter was from the commissioner and was addressed to the president of Insurance Group, who was also the president of Indemnity, and to the secretary and general counsel of Fremont General. The letter purported to express an agreement between the Department of Insurance, Fremont General, Insurance Group, and Indemnity. The letter stated among other things that Fremont General would contribute up to $92.75 million in cash to Insurance Group and Indemnity in 2002 and subsequent years and that, in return, Indemnity would transfer to Fremont General all rights with respect to "the net operating loss of or attributable to FIC [Indemnity] ('the NOL')." The letter stated that the payments would cease, however, if the commissioner obtained an order for

conservation of Indemnity before March 1, 2004.[2] It stated that the Department of Insurance consented to these terms and that if Indemnity were placed in liquidation, the department would seek "to preserve the benefit of the NOL for FGC [Fremont General]."[3]

Paragraph 21 of the letter stated: "All intercompany balances between Fremont [defined as Insurance Group and Indemnity collectively] and FGC [Fremont General] as of the effective date of this agreement shall be considered settled, which includes all management fees paid or incurred as well as any intercompany tax balances arising out of the Tax Sharing Agreement between Fremont and FGC. The Department [of Insurance] agrees and acknowledges that all intercompany tax balances between Fremont and FGC have been paid and settled and that no additional tax payments for tax years 2001 and prior are due from FGC. Further, the Department agrees and acknowledges that the utilization in the FGC consolidated income tax returns of any tax net operating losses generated prior to January 1, 2002 by Fremont or Comstock Insurance Company, shall not give rise to a liability for any additional tax settlement payments to FCIG [Insurance Group] and its associated companies. FGC agrees that no additional taxes will be owed by Fremont in the event that any pending or future IRS tax audit results in additional taxes owed." The letter stated further: "As of the date this Agreement is executed by all parties to it, this Agreement supersedes and terminates the November 27, 2000 Letter in all respects." The letter was

---

[2] Paragraph 18 of the letter stated, in relevant part: "This Agreement will be superseded, in its entirety, except for Paragraphs 19 and 21 herein, if prior to March 1, 2004, the Department obtains an Order of Conservation from a California Superior Court. However, contributions received pursuant to Paragraph 20 are not refundable under any circumstance. On and after March 1, 2004, this Agreement shall remain in full force and effect until a) the Department provides written notice to Fremont [defined as Insurance Group and Indemnity collectively] that it is released from its obligations required herein or b) it is superseded by Order of a California Superior Court except for Paragraphs 19 and 20, which shall remain in full force and effect."

[3] Paragraph 19 of the letter stated: "In consideration of FGC [Fremont General] agreeing to make the contributions to FIC [Indemnity] described in Paragraph 20 hereof, FIC hereby transfers to FGC, with the Department's express consent, any and all right, title and interest in and to the right to benefit from the net operating loss of or attributable to FIC (the 'NOL'). The Department acknowledges that the NOL is critical to and the property of FGC and maintenance of such asset is dependent on the continued consolidation of FIC with FGC for federal income tax purposes. The Department shall cooperate with FGC in the preparation of consolidated income tax returns and shall not request from the Internal Revenue Service termination of status of FIC as a member of the FGC consolidated group. If FGC is placed into conservatorship or receivership, neither the Department nor any of its agents or representatives shall sell any or all of FIC stock, issue FIC stock, claim tax exempt or nonprofit status for FIC or transfer substantially all of the assets of FIC to another corporation. If FIC is placed in liquidation, the Department shall consult with FGC and its advisors and shall take such reasonable actions as requested by FGC necessary to preserve the benefit of the NOL for FGC, consistent with the Department's obligations to FIC's policyholders and creditors."

signed by Fremont General, Insurance Group, and Indemnity on June 28, 2002, and by the commissioner on July 2, 2002.

Fremont General and Insurance Group argued that counts one, two, and three fail to state a cause of action for two independent reasons. First, they argued that under the terms of the July 2, 2002, letter agreement, Indemnity transferred all of its past and future net operating losses to Fremont General, including those that Indemnity later acquired by merger with Comstock. Second, they argued that apart from the letter agreement, Fremont General had a fiduciary obligation to use Comstock's net operating losses to offset the taxable income of other affiliated companies, and the net operating losses had no value to Indemnity because Indemnity had no taxable income, so Indemnity and Comstock were not entitled to compensation for use of the net operating losses. They also argued that count three is defective because the complaint fails to allege the terms of the intercompany tax allocation agreement or attach a copy of the agreement to the complaint.

Fremont General and Insurance Group argued that counts four through seven fail to state a cause of action to the extent they are based on the alleged misappropriation of Comstock's net operating losses, for the same reasons stated *ante*. They also argued that those counts fail to state a cause of action based on the alleged misappropriation of Re's assets because only Re, not Indemnity, is a real party in interest with standing to sue on those counts, and the complaint does not allege a separate injury to Indemnity as Re's former shareholder; that to the extent those counts are based on Comstock's alleged payment of commutations that were also Re's liabilities, Re is an indispensable defendant and Fremont General and Insurance Group are not proper defendants; and, with respect to count seven, that the unauthorized taking of an intangible property interest that is not merged with or reflected in tangible property is not an actionable conversion.

Fremont General and Insurance Group argued that counts eight, nine, and ten fail to state a cause of action because those counts are based on statutes and are required to be pleaded with particularity, but are not pleaded with particularity. They also argued that the letter agreement dated July 2, 2002, bars those counts to the extent they are based on the alleged misappropriation of Comstock's net operating losses; that Indemnity alleges standing as Comstock's creditor to avoid fraudulent transfers and preferences arising from Comstock's payment of commutations, but Indemnity has no standing as Comstock's creditor because the two companies have merged; that any claim arising from Comstock's payment of commutations "must be asserted . . . against [Re]"; that only Re has standing to sue to remedy the alleged misappropriation of Re's assets; that count eight, to the extent it is based on the alleged manipulation of Re, is barred by the four-year statute of

limitations under the Uniform Fraudulent Transfer Act (Civ. Code, § 3439.09) because the alleged fraudulent transfers all occurred more than four years before Indemnity filed its complaint, with the sole exception of the alleged improper dividend in October 2000, which can support a cause of action against Insurance Group only; and that the alleged fraudulent transfers and avoidable preferences involving Re all occurred more than one year before the filing of the petition for liquidation (see Ins. Code, §§ 1034, subd. (a), 1034.1, subd. (a)) and therefore cannot support counts nine and ten.

Fremont General and Insurance Group argued that counts eleven and twelve fail to state a cause of action because they are statutory claims but are not pleaded with particularly as required. They also argued that Insurance Code section 1215.5 authorizes the commissioner to regulate the transactions of insurers but does not authorize a civil remedy against an insurer's holding company or affiliates. Finally, they argued that Insurance Code section 1215.16 authorizes the commissioner as liquidator to recover only distributions of shares of stock or monetary bonuses, but the complaint fails to allege such a distribution.

Indemnity opposed both the demurrer and the request for judicial notice. They argued that the July 2, 2002, letter agreement by its terms did not relieve the defendants of liability for their use of Comstock's net operating losses and that the letter agreement was unenforceable because it was obtained by fraud. Indemnity also moved to strike purported statements of fact asserted by Fremont General and Insurance Group in the demurrer. Fremont General and Insurance Group opposed the motion to strike on the ground of insufficient notice. After a hearing on the demurrer on April 22, 2005, the court entered a minute order ruling on the demurrer and related matters. The court took judicial notice of the letter agreement of July 2, 2002, "consistent with the Court's previous ruling."[4] The minute order stated that the defendants' "objections" to Indemnity's motion to strike were "overruled," but failed to rule on the motion to strike. The minute order stated, "Demurrers are sustained without leave to amend. The letter agreement of July 1, 2002 [*sic*] written by the Insurance Commissioner allows Fremont General to use the NOL's in the very manner now complained of by the Insurance Commissioner. [¶] Paragraph 21 of that letter makes specific reference to Comstock Insurance Company. As to the allegations on behalf of

---

[4] Fremont General and Insurance Group had requested judicial notice of the letter agreement dated July 2, 2002, in the NOL action. In that action, they cited no statutory authority for judicial notice, but argued that reference to the document was essential to an understanding of the facts alleged in the complaint. Indemnity did not oppose the request. The court granted the request, stating only, "Judicial Notice is taken of the July 2, 2002 letter agreement." We take judicial notice of the request for judicial notice filed in the NOL action on August 16, 2004, and the minute order in that action dated January 25, 2005, pursuant to Evidence Code sections 452, subdivision (d) and 459.

and against Fremont Re (Bermuda), that entity is not a party to this case." The court later entered a judgment of dismissal. Indemnity appealed the judgment.

### 4. *Related Appeals*

We filed an opinion in case No. B182250 on September 20, 2006 (*Fremont Indemnity Co. v. Fremont General Corp.* (2006) 143 Cal.App.4th 50 [49 Cal.Rptr.3d 82] (*Fremont*)), in which we reversed orders disqualifying counsel for Fremont General and Insurance Group in both the Comstock action and the NOL action. On this date, we have also filed an opinion in case No. B188900 (*Fremont Indemnity Co. v. Fremont General Corp., supra,* B188900) in which we reversed the judgment of dismissal after the sustaining of a demurrer without leave to amend to Indemnity's complaint in the NOL action.

## CONTENTIONS

Indemnity contends (1) the parties dispute whether the letter agreement is enforceable and its proper interpretation, and the court cannot resolve those disputes by reliance on judicial notice; (2) the letter agreement by its terms did not transfer Comstock's net operating losses to Fremont General or relieve Fremont General of its liability to Comstock or Indemnity for use of those net operating losses; (3) the court effectively found that the commissioner was estopped from exercising his statutory powers as liquidator due to the letter agreement, but the commissioner as liquidator acts as a trustee for the benefit of creditors, a role distinct from his role as regulator, and the commissioner's preliquidation regulatory activities cannot diminish or defeat his statutory powers as liquidator; (4) the commissioner cannot be estopped from acting for the benefit of innocent policyholders, creditors, and the public by avoiding preferences and fraudulent transfers; (5) Comstock's net operating losses were the property of and had value to Indemnity, and Indemnity is entitled to compensation for Fremont General's use of the net operating losses; (6) Indemnity has standing to sue Fremont General and Insurance Group for injuries suffered by Indemnity as a result of the defendants' misappropriation of Re's assets and manipulation of Re's reinsurance obligations; and (7) counts four through six are not directed against Re, the defendants as Re's corporate parents are not prejudiced by Re's absence, and Re's absence is not an obstacle to achieving complete relief among the parties.

## *DISCUSSION*

### 1. *Standard and Scope of Review*

We independently review the ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and matters of which judicial notice has been taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We construe the pleading in a reasonable manner and read the allegations in context. (*Ibid.*) We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

■ A court sustaining a demurrer without leave to amend is required to state "the specific ground or grounds upon which the decision or order is based which may be by reference to appropriate pages and paragraphs of the demurrer." (Code Civ. Proc., § 472d.) The grounds for a demurrer are those listed in Code of Civil Procedure section 430.10, including among others the failure to state facts sufficient to constitute a cause of action (*id.*, subd. (e)). The grounds for a demurrer differ from the reasons for sustaining a demurrer on a particular ground. A court sustaining a demurrer is required to state the specific grounds for its decision, but is not required to state its reasons for sustaining the demurrer on the specified grounds. (*Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 275 [29 Cal.Rptr.2d 398]; *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 943 [143 Cal.Rptr. 255].) Regardless of whether the superior court complies with this requirement, a reviewing court reviews the judgment rather than the reasons for the judgment and must affirm the judgment if any of the grounds stated in the demurrer is well taken. (*E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 504, fn. 2 [146 Cal.Rptr. 614, 579 P.2d 505]; *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 670 [247 Cal.Rptr. 304]; *Weinstock v. Eissler* (1964) 224 Cal.App.2d 212, 224–225 [36 Cal.Rptr. 537].)

The California Supreme Court has held that if a demurrer made on general and special grounds is sustained without leave to amend without specifying the grounds for the decision, the reviewing court must assume that the court sustained only the general demurrer and did not rule on the special demurrer. (*Briscoe v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 544 [93 Cal.Rptr. 866, 483 P.2d 34], overruled on another point in *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 685, 697, fn. 9 [21 Cal.Rptr.3d

663, 101 P.3d 552]; see *E. L. White, Inc. v. City of Huntington Beach, supra,* 21 Cal.3d at p. 504, fn. 1.) Although the court here did not expressly specify the grounds for its decision, the reasons stated in the minute order indicate that the court sustained a general demurrer on the ground of failure to state facts sufficient to constitute a cause of action (Code. Civ. Proc., § 430.10, subd. (e)). The court concluded that the letter agreement provided a defense to the counts to the extent they were based on the alleged misappropriation of net operating losses. The court apparently also concluded that some of the counts to some extent were based on injuries to Re for which Indemnity had no standing to sue, and that some of the allegations were directed against Re and did not support a cause of action against Fremont General or Insurance Group. The existence of a defense to the allegations alleged in the complaint, lack of standing to sue, and the failure to state facts sufficient to constitute a cause of action against a particular defendant are general grounds for demurrer in that all are considered a failure to state facts sufficient to constitute a cause of action. (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183 [123 Cal.Rptr.2d 637]; *Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419, 427 [8 Cal.Rptr.2d 869].) Accordingly, we assume that the court sustained only the general demurrer and will consider all the reasons for general demurrer asserted in the demurrer. But we assume that the court did not rule on the special demurrer to counts four through seven based on the absence of an indispensable defendant or the special demurrer to count three based on uncertainty.

2. *The Court Erred by Taking Judicial Notice of the Proper Interpretation and Enforceability of the Letter Agreement and by Deciding Those Questions in Ruling on the Demurrer*

Indemnity alleges in the complaint that Fremont General, Insurance Group, and Indemnity "purported to enter into a second agreement, allegedly memorialized by a letter dated July 2, 2002 ('July 2, 2002 Letter'), to replace the November 27, 2000 Letter, but continuing the requirement from the November 27, 2000 Letter that Fremont Indemnity would submit to the Commissioner's ongoing supervision and regulatory oversight." Indemnity alleges that Fremont General and Insurance Group "breached the November 27, 2000 Letter and the July 2, 2002 Letter . . . by concealing material transactions from the Commissioner as regulator of Fremont Indemnity and Comstock." Indemnity alleges further that the transactions between Comstock and Re were not subject to the commissioner's oversight under the July 2, 2002, letter agreement and that the alleged transfer of liabilities from Re to Comstock and then merging of Comstock into Indemnity was "a violation of the terms of the July 2, 2002 Letter." Thus, the complaint alleges the existence of a letter dated July 2, 2002, alleges that the letter purports to memorialize an agreement, and alleges that Fremont General and Insurance

Group violated the terms of the purported agreement. Those are the only references to the July 2, 2002, letter in the complaint. The complaint does not attach a copy of the letter.

Fremont General and Insurance Group requested judicial notice of a letter dated July 2, 2002. They cited no statutory authority for the request, but argued that the court had taken judicial notice of the same letter in the NOL action and that consideration of the letter was essential to a proper understanding of the allegations of the complaint. They cited *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280 [89 Cal.Rptr.2d 60] and *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122 [226 Cal.Rptr. 321] for the latter proposition. Fremont General and Insurance Group argue on appeal that the trial court properly took judicial notice of the letter under Evidence Code section 452, subdivision (d), which authorizes judicial notice of court records. They argue that the letter was judicially noticeable because it was part of the superior court record in the NOL action. They argue further that under the terms of the letter agreement, the commissioner clearly and unambiguously released them from any liability to Indemnity for their use of Comstock's net operating losses.

"Judicial notice may not be taken of any matter unless authorized or required by law." (Evid. Code, § 450.) Matters that are subject to judicial notice are listed in Evidence Code sections 451 and 452. A matter ordinarily is subject to judicial notice only if the matter is reasonably beyond dispute. (*Post v. Prati* (1979) 90 Cal.App.3d 626, 633 [153 Cal.Rptr. 511].) Although the *existence* of a document may be judicially noticeable, the truth of statements contained in the document and its proper interpretation are not subject to judicial notice if those matters are reasonably disputable. (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 457, fn. 9 [84 Cal.Rptr.2d 843, 976 P.2d 214].) *StorMedia* stated: "In ruling on a demurrer, a court may consider facts of which it has taken judicial notice. (Code Civ. Proc., § 430.30, subd. (a).) This includes the existence of a document. When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable. (*Joslin* v. *H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374 [228 Cal.Rptr. 878].)" (*Ibid.*)

*Joslin* v. *H.A.S. Ins. Brokerage, supra,* 184 Cal.App.3d at page 374 stated: "Taking judicial notice of a document is not the same as accepting the truth of its contents or accepting a particular interpretation of its meaning. (See *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1038 [96 Cal.Rptr. 338].) On a demurrer a court's function is limited to testing the legal sufficiency of the complaint. (*Marina Tenants Assn.* v. *Deauville Marina Development Co.*[, *supra,*] 181 Cal.App.3d [at p.] 127 [226 Cal.Rptr. 321].) 'A demurrer is simply not the appropriate procedure

for determining the truth of disputed facts.' (*Ramsden v. Western Union* (1977) 71 Cal.App.3d 873, 879 [138 Cal.Rptr. 426].) The hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable. (See *Del E. Webb Corp.* v. *Structural Materials Co.* (1981) 123 Cal.App.3d 593, 605 [176 Cal.Rptr. 824].)" *Joslin, supra,* at page 375 stated further, " 'judicial notice of matters upon demurrer will be dispositive only in those instances where there is not or cannot be a factual dispute concerning that which is sought to be judicially noticed.' (*Cruz* v. *County of Los Angeles* (1985) 173 Cal.App.3d 1131, 1134 [219 Cal.Rptr. 661].)"

█ The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract, or extrinsic evidence may reveal a latent ambiguity. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37–39 [69 Cal.Rptr. 561, 442 P.2d 641].) A court determining whether a contract is ambiguous must first consider extrinsic evidence offered to prove the parties' mutual intention. If the court determines that the contract is reasonably susceptible of an interpretation supported by extrinsic evidence, the court must admit that evidence for purposes of interpreting the contract. (*Id.* at pp. 39–40.) A court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous. (*Id.* at p. 37.)[5] Instead, a court must provisionally consider extrinsic evidence offered by the parties in the manner we have stated.

█ For a court to take judicial notice of the meaning of a document submitted by a demurring party based on the document alone, without

---

[5] "[T]he 'meaning of language is to be found in its applications. An indeterminacy in the application of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application.' [Citations.] [¶] Accordingly, '[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' [Citation.]" (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668, 139 P.3d 56].) "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] [¶] A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 37.)

allowing the parties an opportunity to present extrinsic evidence of the meaning of the document, would be improper. A court ruling on a demurrer therefore cannot take judicial notice of the proper interpretation of a document submitted in support of the demurrer. (*StorMedia Inc. v. Superior Court*, *supra*, 20 Cal.4th at p. 457, fn. 9; *Joslin v. H.A.S. Ins. Brokerage, supra*, 184 Cal.App.3d at p. 374.) In short, a court cannot by means of judicial notice convert a demurrer into an incomplete evidentiary hearing in which the demurring party can present documentary evidence and the opposing party is bound by what that evidence appears to show.

*Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807 [233 Cal.Rptr. 794] illustrates the same principle but with respect to a document attached to the complaint. *Southern Pacific Land Co.* involved an action for declaratory relief and breach of contract relating to an oil and gas lease that was attached to the complaint, rather than judicially noticed. The plaintiff alleged that the lease did not terminate under its own terms, while the defendant maintained that the lease had terminated. (*Id.* at pp. 811–812, 815.) The trial court interpreted the lease and sustained a demurrer to the complaint. The plaintiff argued on appeal that it was entitled to an opportunity to present extrinsic evidence in support of its interpretation of the lease. The Court of Appeal agreed and held that the trial court in ruling on the demurrer without the benefit of extrinsic evidence could not construe the ambiguous lease in a manner contrary to the plaintiff's interpretation as alleged in the complaint. (*Id.* at pp. 816–817.)

Thus, a court ruling on a demurrer cannot decide a question that may depend on disputed facts by means of judicial notice. This rule applies not only with respect to the interpretation of a contract, but also with respect to its enforceability. A court ruling on a demurrer cannot take judicial notice that a contract submitted in support of the demurrer is binding and enforceable if the plaintiff claims the contract is unenforceable due to fraud or duress (see Civ. Code, § 1567). (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145–1146 [37 Cal.Rptr.2d 718].) *Gould* held that it was error for the trial court to take judicial notice of the enforceability of a written contract for purposes of ruling on a demurrer when the plaintiff claimed that he had signed the document under duress. (*Ibid.*)

Indemnity does not allege in the complaint either that the July 2, 2002, letter agreement released the defendants from liability to Indemnity for their use of Comstock's net operating losses or that the letter agreement is an enforceable contract. Because the parties disputed and continue to dispute the proper interpretation of the letter agreement, we conclude that the trial court erred by interpreting the document in ruling on the demurrer. Moreover, the parties also dispute the enforceability of the letter agreement. Indemnity

argued in the trial court and continues to argue on appeal in this action, and alleges in the NOL action, that the defendants obtained the commissioner's consent to the terms stated in the letter by fraudulently concealing from the commissioner material information concerning Indemnity's financial condition. The trial court erred by determining in ruling on the demurrer that the letter agreement is binding and enforceable. The court could not properly foreclose the introduction of extrinsic evidence bearing on the proper interpretation of the letter agreement and its enforceability by deciding those questions based on only the pleadings and matters judicially noticeable. In accordance with the authorities cited above, we conclude that the sustaining of the demurrer based on the terms of the letter agreement was error.

The cases cited by Fremont General and Insurance Group in the trial court are distinguishable. The plaintiff in *Ingram v. Flippo, supra,* 74 Cal.App.4th 1280 alleged that the district attorney published a letter and a media release stating inaccurately that school district board members had violated the Ralph M. Brown Act (Brown Act) (Gov. Code, § 54950 et seq.). The plaintiff sought declaratory and injunctive relief under the Brown Act. The complaint quoted from and summarized parts of the letter, the defendant filed a copy of the letter and media release in support of the demurrer, and both sides referred to the letter and quoted from it at the hearing on the demurrer. The defendants requested judicial notice of the letter and media release on appeal under Evidence Code section 452, subdivision (h), and the plaintiff did not oppose the request. Noting all of those circumstances, the Court of Appeal granted the request for judicial notice of the letter and media release. (*Ingram, supra,* at p. 1285, fn. 3.) The Court of Appeal did not resolve conflicting interpretations of those documents or decide any question of enforceability, as the superior court did here. Rather, *Ingram* held that the plaintiff failed to state a cause of action for declaratory relief under the Brown Act because she did not allege that the district attorney had violated the Brown Act, and that the plaintiff was not entitled to an injunction because the district attorney was specifically authorized to file an action under the Brown Act if he determined that a violation had occurred. (*Ingram, supra,* at pp. 1290–1291.)

The plaintiffs in *Marina Tenants Assn. v. Deauville Marina Development Co., supra,* 181 Cal.App.3d 122 alleged that they were third party beneficiaries of a master lease between the defendants and the County of Los Angeles. They alleged that they had paid excessive rents that were not " 'fair and reasonable' " as required under the lease and sought to recover the alleged excess amounts as damages. The complaint alleged some of the lease terms, and the trial court took judicial notice of the entire master lease. (*Id.* at pp. 126–127 & 128, fn. 1.) On appeal, no party challenged the taking of judicial notice. The Court of Appeal stated that the plaintiffs had pled only selected portions of the lease and that it was proper for the trial court to consider the entire lease. (*Id.* at p. 130.) *Marina Tenants* stated that the lease

was ambiguous as to whether the plaintiffs were intended beneficiaries and that the court could not resolve that ambiguity in ruling on the demurrer. (*Id.* at p. 132.) *Marina Tenants* concluded, however, that even if the plaintiffs were intended beneficiaries, they were not entitled to the requested relief. *Marina Tenants* stated that the lease provided for the county to determine whether rents were fair and reasonable and that absent an allegation that the county had determined that rents were not fair and reasonable, neither the county nor the plaintiffs had a right under the lease to obtain a retroactive rent reduction. (*Id.* at pp. 132–133.) Thus, *Marina Tenants* expressly declined to resolve the parties' conflicting interpretations of a judicially noticed document and did not decide any question of enforceability.

The cases cited by Fremont General and Insurance Group on appeal also are distinguishable. The plaintiff in *Ascherman v. General Reinsurance Corp.* (1986) 183 Cal.App.3d 307 [228 Cal.Rptr. 1] sued a reinsurer, alleging that the plaintiff as the insured was a third party beneficiary of a reinsurance contract. He sought to recover the cost of defending an action from the reinsurer after his liability insurer's liquidation, alleging counts for declaratory relief and unjust enrichment. The Court of Appeal stated that the trial court properly took judicial notice of both the reinsurance contract and a release in favor of the reinsurer from the Illinois Director of Insurance. (*Id.* at pp. 310–311.) *Ascherman* concluded that, consistent with reinsurance contracts generally, the terms of the reinsurance contract indicated that the plaintiff was not an intended beneficiary, and therefore concluded that the complaint failed to state a cause of action for declaratory relief. (*Id.* at pp. 310–312.) *Ascherman* also concluded that the complaint failed to state a cause of action for unjust enrichment because the reinsurer had discharged its responsibilities under the reinsurance contract and obtained a release from the Director of Insurance, and because the plaintiff had failed to timely file a claim in liquidation. (*Id.* at pp. 310, 312 & fn. 6.) The parties in *Ascherman* did not dispute the enforceability of the reinsurance contract or release. Moreover, it appears from the opinion that there was no significant dispute as to the interpretation of those documents and no contention that extrinsic evidence was relevant.

The plaintiff in *Laughner v. Bryne* (1993) 18 Cal.App.4th 904 [22 Cal.Rptr.2d 671] sought to recover damages on her own behalf for future medical and support expenses that she would incur to care for her injured child. The Court of Appeal concluded that the plaintiff was precluded from recovering those damages because she had settled and released claims for the same damages on behalf of her minor child. (*Id.* at pp. 910–912.) The trial court had approved the settlement and release and took judicial notice of the document in ruling on the demurrer. (*Id.* at pp. 907–908.) The parties did not dispute the enforceability of the release, and there was no contention that extrinsic evidence was relevant to its interpretation.

*Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717 [33 Cal.Rptr.2d 291], also cited by Fremont General and Insurance Group, held that the plaintiff lessee was not a third party beneficiary of the lessor's insurance policy. The plaintiff apparently alleged the relevant policy terms in the complaint or attached a copy of the policy to the complaint (*id.* at p. 1721), and there was no mention of judicial notice in the opinion. *Jones* concluded that the terms of the policy indicated that the plaintiff was not an intended beneficiary. The parties did not dispute the enforceability of the policy, and there was no contention that extrinsic evidence was relevant to its interpretation. Similarly, *Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680 [22 Cal.Rptr.2d 807, 23 Cal.Rptr.2d 807] held that a settlement agreement between the plaintiff, a defendant in another action, and that defendant's insurer could not reasonably be interpreted to allow the plaintiff to recover from the insurer attorney fees, costs, and interest. The settlement agreement apparently was attached to the complaint. The parties did not dispute the enforceability of the settlement agreement, and there was no contention that extrinsic evidence was relevant to its interpretation.

Finally, in *Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555 [260 Cal.Rptr. 237], the plaintiff sued for breach of contract and other counts based on an alleged written contract to employ the plaintiff as a hospital medical director and attached a copy of the alleged contract to the complaint. The alleged contract was a letter from the hospital to the plaintiff, countersigned by the plaintiff, expressly stating that the letter was preliminary to a proposed "future agreement" and written contract. (*Id.* at pp. 1558–1559 & fn. 1.) The plaintiff did not allege that the letter was ambiguous or that it was susceptible of the interpretation that it was a present agreement. (*Id.* at pp. 1561–1562.) *Beck* cited the rule that if the plaintiff fails to allege that a document attached to the complaint has a special meaning, a court ruling on a demurrer will interpret the document on its face to determine as a matter of law whether it is reasonably susceptible of an interpretation that would support a cause of action. (*Id.* at p. 1561, citing *Hillsman v. Sutter Community Hospitals* (1984) 153 Cal.App.3d 743, 749–750 [200 Cal.Rptr. 605] and *California Assn. of Highway Patrolmen v. Department of Personnel Admin.* (1986) 185 Cal.App.3d 352, 361 [229 Cal.Rptr. 729].) Interpreting the letter on its face, *Beck* concluded that the letter was not a binding contract. (*Beck, supra,* at pp. 1562–1563.) Thus, the court interpreted the letter on its face without regard to the possibility of extrinsic evidence because the plaintiff relied on the letter as the basis for his cause of action but failed to allege any special meaning. Here, in contrast, Indemnity does not rely on the letter dated July 2, 2002, to support a cause of action and did not attach a copy of the letter to its complaint, and therefore is not precluded from presenting extrinsic evidence concerning the enforceability and proper interpretation of the letter.

### 3. The Sustaining of the Demurrer Cannot Be Affirmed Based on the Other Reasons Cited by the Trial Court

A demurrer must dispose of an entire cause of action to be sustained. (*PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682 [40 Cal.Rptr.2d 169].) Counts one, two, and three are based exclusively on the alleged misappropriation of Comstock's net operating losses, while counts four through twelve are based on that and also on the alleged misappropriation of other assets involving Re. The trial court's conclusion that Indemnity lacks standing to sue for injuries to Re and that some of the allegations are directed against Re concerns only the alleged misappropriation of assets involving Re and does not dispose of an entire count or cause of action. We therefore conclude that the demurrer cannot be sustained to any count based on the reasons cited by the trial court and express no opinion as to the validity of those reasons. We will now address the other reasons for general demurrer asserted in the demurrer but not relied on by the trial court.

### 4. The Complaint Adequately Alleges a Cause of Action for Conversion

Fremont General and Insurance Group demurred to count seven for conversion arguing that the unauthorized taking of an intangible property interest that is not merged with or reflected in tangible property is not actionable as conversion. Conversion is generally described as the wrongful exercise of dominion over the personal property of another. (*Gruber v. Pacific States Sav. & Loan Co.* (1939) 13 Cal.2d 144, 148 [88 P.2d 137].) The basic elements of the tort are (1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages. (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066 [80 Cal.Rptr.2d 704].)

*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1565 [54 Cal.Rptr.2d 468] stated, "Courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible. (*Adkins* v. *Model Laundry Co.* (1928) 92 Cal.App. 575, 583 [268 P. 939] [business goodwill]; *Olschewski* v. *Hudson* (1927) 87 Cal.App. 282, 286–288 [262 P. 43] [competitor's customer route]; *Faircloth* v. *A.L. Williams & Associates* (1992) 206 Ga.App. 764 [426 S.E.2d 601, 604–605] [unpaid commissions not evidenced by a receipt or certificate]; *Matzan* v. *Eastman Kodak Co.* (1987) 134 A.D.2d 863 [521 N.Y.S.2d 917, 918] [no protected interest in an idea].) And Dean Prosser has cautioned against scuttling conversion's tangibility requirement altogether, recommending instead the use of other remedies to protect intangible interests. (Prosser &

Keeton on Torts [(5th ed. 1984)] § 15, p. 92.) [Fn. omitted.]"[6] *Thrifty-Tel* involved unauthorized use of the plaintiff's access and authorization codes to make long distance telephone calls. The jury found the defendants liable for conversion. The Court of Appeal concluded that the evidence supported the verdict based on a theory of trespass to personal property and declined to decide whether the evidence established liability for conversion. (*Thrifty-Tel, Inc.* at pp. 1565–1566.) The quoted language from the opinion was dictum.

The California Supreme Court in *Payne v. Elliot* (1880) 54 Cal. 339 held that the defendant was liable for trover for the conversion of shares of stock despite the absence of any allegation that the plaintiff had owned or that the defendant had converted share certificates. (*Id.* at p. 340.) *Payne* stated: "At common law, trover was the proper remedy for a conversion of personal property; but it lay only for tangible property, capable of being identified and taken into actual possession. The conversion of the property was the gist of the action; and the action did not lie, unless the defendant had become actually possessed of the property by some means, whether of finding or otherwise. Shares of stock, and such things, did not belong to that class of property known as chattels; they were considered incorporeal, intangible things, which existed in idea, and were incapable of being subjected to actual possession. . . . The certificates themselves were not considered property, but were considered evidence of property. Wherever common-law ideas of personal property prevail, courts hold that trover is not the proper remedy for the conversion of things which were considered at common law as mere personal rights, not reducible into possession, but recoverable by law. . . .

"But the fiction on which the action of trover was founded, namely, that a defendant had found the property of another, which was lost, has become, in the progress of law, an unmeaning thing, which has been by most courts discarded; so that the action no longer exists as it did at common law, but has been developed into a remedy for the conversion of every species of personal property. It lies for bank notes sealed in a letter (*Moody* v. *Keeney*, 7 Ala. 218); for negotiable instruments (*Comparet* v. *Burr*, 5 Blackf. 419); for a judgment (*Hudspeth* v. *Wilson*, 2 Dev. N. C. 372); for a promissory note which has been paid (*Pierce* v. *Gilson*, 9 Vt. 216); for copies of a creditor's account (*Fulton* v. *Cunningham*, 16 Vt. 697); for a writ of execution issued

[6] Section 242 of the Restatement Second of Torts, published in 1965, states: "(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights. [¶] (2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted." (Boldface omitted.) The comments to section 242 recognized that the law of conversion was undergoing a "process of extension" at that time and stated, "nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found." (*Id.*, com. f, p. 475; see *id.*, com. b, pp. 473–474.)

on a judgment (*Keeler* v. *Fassett*, 21 Vt. 539); and for *certificates* of shares of stock (*Anderson* v. *Nicholas*, 28 N. Y. 600; *Atkins* v. *Gamble*, 42 Cal. 86; *Von Schmidt* v. *Bourne*, 50 Id. 616.)" (*Payne* v. *Elliot*, *supra*, 54 Cal. at pp. 340–341.)

*Payne* v. *Elliot*, *supra*, 54 Cal. at page 342 stated further: "It is, therefore, the 'shares of stock' which constitute the property which belongs to the shareholder. Otherwise, the property would be in the certificate; but the certificate is only evidence of the property; and it is not the only evidence, for a transfer on the books of the corporation, without the issuance of a certificate, vests title in the shareholder: the certificate is, therefore, but additional evidence of title, and if trover is maintainable for the certificate, there is no valid reason why it is not also maintainable for the thing itself which the certificate represents. For, as the Supreme Court of Connecticut say, 'If a certificate of stock is unlawfully retained when demanded, what is presumed to have been converted? The certificate has no intrinsic value disconnected from the stock it represents. No one would say that the paper alone had been converted—that the conversion of the paper constitutes the entire wrong. The real act done in such cases is precisely the same as that done here—no more, no less; and to say that trover will lie in one case and not in the other, is to make a distinction where in reality there is no difference. * * * The stock in both cases was converted; and we think that in these days, when the tendency of courts is to do away with technicalities not based upon reason, a technical distinction of this character should no longer be sustained.' (*Ayres* v. *French*, 41 Conn. 142.) In *Boylan* v. *Hagnel*, 8 Nev. 352, and in *Kuhn* v. *McAllister*, 1 Utah 273, actions of this character for 'shares of stock' were sustained. It follows that the Court below did not err in overruling the demurrer to the complaint, or in rendering judgment for the plaintiff for the value of the stock and interest thereon from the time of the conversion until the time of the trial."

■ Thus, *Payne* v. *Elliot*, *supra*, 54 Cal. 339 concluded that to allow a conversion action if the defendant misappropriated shares of stock by converting share certificates but disallow the action if the defendant misappropriated shares of stock without converting share certificates would perpetuate a " 'technicalit[y] not based upon reason' " (*id.* at p. 342). *Payne* concluded that the defendant's conversion of shares of stock, an intangible property interest, without converting share certificates was an actionable conversion.

*Olschewski* v. *Hudson*, *supra*, 87 Cal.App. at page 288 stated of *Payne* v. *Elliot*, *supra*, 54 Cal. 339: "That case in fact does say: 'The fiction on which the action of trover was founded, namely, that a defendant had found the property of another, which was lost, has become, in the progress of the law, an unmeaning thing which has been by most courts discarded; so that the

action no longer exists as it did at common law, but has been developed into a remedy for the conversion of every species of personal property.' This language is also quoted in 24 Cal. Jur. 1030, section 7, which text is supported only by the one authority above mentioned. But this is too broad a statement as to the application of the doctrine of conversion or trover, and it was unnecessary to the determination of the issue in that case. All that was involved in the Payne case, *supra*, was the question as to whether conversion would lie for the unlawful appropriation of shares of stock in a mining company. Shares of stock are represented by certificates which are evidence of a definite interest in the assets of a company. *Shares of stock are tangible and may be identified.* It is the uniform rule of law that shares of stock in a company are subject to an action in conversion. (26 R. C. L. 1105; 7 R. C. L. 197, sec. 166; *Ralston* v. *Bank of California*, 112 Cal. 208, 213 [44 Pac. 476]; *Jackins* v. *Bacon*, 63 Cal.App. 463, 468 [218 Pac. 1027]; *People* v. *Flanagan*, 60 Cal. 1 [44 Am.Rep. 52].)" (Italics added.)

*Olschewski* v. *Hudson*, *supra*, 87 Cal.App. 282 held that the alleged misappropriation of a list of laundry customers, which was not reduced to writing but was known to an employee, was not an actionable conversion and affirmed the sustaining of a demurrer to the plaintiff's complaint. *Olschewski* likened the list of laundry customers to a company's goodwill and stated: "Unlawful interference with property rights in the goodwill of a business, or the benefits of trade and patronage of a specific list of customers in a definite route may be protected by injunctive relief in a court of equity. [Citations.] But there is nothing definite or tangible in the character of the ordinary list of laundry customers which makes an effort to transfer the district in which they live subject to an action in conversion. No authority has been furnished, which sustains the maintenance of an action in trover or conversion for the unlawful interference with a laundry route, or any similar property right. Clearly the proceeding in conversion was not intended to reach so intangible, uncertain, and indefinite a property right. The very meaning of the word 'conversion,' as it is used in this sense, is to 'change into another form, substance or state; to transform, or change, as in law, the wrongful appropriation to one's own use of the goods of another.' (Standard Dictionary.) The very definition of the word presupposes the existence of tangible goods or chattels in a form capable of being changed or transformed, turned over, delivered, or appropriated for the use and benefit of the wrongdoer. In 38 Cyc. 2011 it is said that conversion lies for 'every species of tangible personal property which is the subject of private ownership.' In this case conversion is used as a term synonymous with trover. (Black's Law Dictionary, 1174.) Trover comes from a French word meaning to find, and is defined as 'a form of action which lies to recover damages against one who has, without right converted to his own use goods or personal chattels, in which the plaintiff has a general or special property. . . . It was originally an action of

trespass on the case where goods were found by the defendant and retained against the plaintiff's rightful claim. The manner of retaining possession soon came to be disregarded, as the substantial part of the action is the conversion to the defendant's use; so that the action lies whether the goods came into the defendant's possession by finding or otherwise, if he fails to deliver them upon the rightful claim of the plaintiff. It differs from detinue and replevin in this, that it is brought for damages and not for the specific articles; and from trespass in this, that the injury is not necessarily a forcible one, as trover may be brought in any case where trespass for injury to personal property will lie.' (3 Bouvier's Law Dictionary, 3d Rev. 3326.) Various authorities confine the application of the proceeding of trover or conversion to the wrongful interference with specific tangible goods or chattels. 'In substance it (trover) is a remedy to recover the value of personal chattels wrongfully converted by another to his own use.' (1 Chitty on Pleading, 14th Am. ed., 146.) It is 'a generic term applied to those torts, arising from the wrongful conversion of any particular piece of personal property owned by another.' (*Spellman* v. *Richmond & D. R. Co.*, 35 S. C. 475 [28 Am.St.Rep. 858, 14 S. E. 947].) 'In form it is a fiction, in substance a remedy to recover the value of personal chattels wrongfully converted by another to his own use.' (1 Burr. 31.) 'Trover lies for specific chattels wrongfully converted, and not for money had and received for payment of debts. It does not operate on chattels generally, but specifically, such as money in coin, or bills, animals or other property capable of identification as being the actual property or thing wrongfully taken or converted.' (*Kerwin* v. *Balhatchett*, 147 Ill.App. 561, 566.) And in 26 R. C. L. 1105, it is said: 'An action in trover is not maintainable for the conversion of a bill or note unless the plaintiff can show that he was entitled to the possession of the specific property in question.' From the foregoing authorities it appears that the action of trover or conversion lies only for the wrongful appropriation of goods, chattels or personal property which is specific enough to be identified, and not to such indefinite, intangible and uncertain property rights as the mere goodwill of a business, or trade secrets (*Roystone* v. *Woodbury*, 67 Misc.Rep. 265 [122 N. Y. Supp. 444]), or a newspaper route (*Boehm* v. *Spreckels*, 183 Cal. 239 [191 Pac. 5]), or a licensed market stall for transacting trade. (*Meier* v. *Wilkins*, 15 App.Div. 97 [44 N. Y. Supp. 274].)" (*Olschewski, supra*, at pp. 286–288.)

Contrary to *Olschewski v. Hudson, supra*, 87 Cal.App. 282, we see no indication in *Payne v. Elliot, supra*, 54 Cal. 339 that the Supreme Court concluded that shares of stock were tangible property and therefore were the proper subject of a conversion action. In our view, rather than attempt to conform to the common law rule restricting a conversion action to tangible property, *Payne* acknowledged that shares of stock were intangible property

and rejected the common law rule, at least as applied to shares of stock.[7] Moreover, the statement in *Payne* that "the action no longer exists as it did at common law, but has been developed into a remedy for the conversion of every species of personal property" (*Payne*, at p. 341) suggests a much broader rejection of the restrictive common law rule. Although the authorities cited for that statement all involved either documents evidencing intangible property or documents with their own inherent value (*ibid.*), *Payne* went beyond those authorities by holding that the conversion of shares of stock was actionable even without the conversion, or even the existence, of a document evidencing ownership of the shares. *Payne* rejected the common law rule that only a tangible property interest can be unlawfully converted.[8]

■ The specific holding in *Olschewski v. Hudson, supra,* 87 Cal.App. 282 was that a list of laundry customers that had not been reduced to writing was more akin to business goodwill or a trade secret than to tangible personal property and was too "intangible, uncertain, and indefinite a property right" to be the subject of a conversion action. (*Id.* at pp. 286–288.)[9] We recognize that the common law of conversion, which developed initially as a remedy for the dispossession or other loss of chattel (1 Harper et al., Torts (rev. 3d ed. 2006) Interference with Chattels, § 2.7, pp. 178–183), may be inappropriate for some modern intangible personal property, the unauthorized use of which can take many forms. In some circumstances, newer economic torts have developed that may better take into account the nature and uses of intangible property, the interests at stake, and the appropriate measure of damages. On the other hand, if the law of conversion can be adapted to particular types of intangible property and will not displace other, more suitable law, it may be appropriate to do so. (*Payne v. Elliot, supra,* 54 Cal. at pp. 340–342.) The appropriate scope of a conversion action as applied to intangible personal property has been the subject of scholarly and informative discussion. (See,

[7] Shares of stock in a corporation are intangible property (*Ashton v. Heydenfeldt* (1899) 124 Cal. 14 [16, 56 P. 624]; see *Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 875 [35 Cal.Rptr.2d 651, 884 P.2d 108]), although a certificate representing those shares is tangible property (*Englert v. Ivac Corp.* (1979) 92 Cal.App.3d 178, 184 [154 Cal.Rptr. 804]).

[8] Similarly, the Court of Appeal in *A & M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 570 [142 Cal.Rptr. 390] concluded that the unauthorized duplication and sale of music recordings constituted conversion, stating, "The court correctly found that such misappropriation and sale of the intangible property of another without authority from the owner is conversion. [Citations.]"

[9] *Thrifty-Tel, Inc. v. Bezenek, supra,* 46 Cal.App.4th at page 1565 cited only *Olschewski v. Hudson, supra,* 87 Cal.App. 282, *Adkins v. Model Laundry Co., supra,* 92 Cal.App. 575, and two out-of-state cases in support of the statement, "Courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible." *Adkins* followed *Olschewski* and held that the plaintiff in an action for breach of a laundry services contract could not recover tort damages for the conversion of individual customers on a laundry route. (*Adkins, supra,* at pp. 583–585.)

e.g., Harper et al., *supra*, § 2.13, pp. 204–214; Comment, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen* (2005) 42 Hous. L.Rev. 489; 1 Dobbs, Law of Torts (2001) Direct and Intentional Interference with Property, § 63, pp. 132–135; Comment, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine* (1991) 1991 BYU L.Rev. 1681; Prosser and Keeton, Torts, *supra*, Intentional Interference with Property, § 15, pp. 90–92; see also *Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024, 1029–1036.[10])

■ A net operating loss is a definite amount (see 26 U.S.C. § 172(c)) that can be recorded in tax and accounting records. The significance of this, in our view, is not that the intangible right is somehow merged or reflected in a document, but that both the property and the owner's rights of possession and exclusive use are sufficiently definite and certain.[11] The misappropriation of a net operating loss without compensation in the manner alleged in the complaint, causing damage to Indemnity as alleged, is comparable to the misappropriation of tangible personal property or shares of stock for purposes relevant here. We see no sound basis in reason to allow recovery in tort for one but not the other. We therefore decline to follow either *Olschewski v. Hudson, supra*, 87 Cal.App. 282 or the dictum in *Thrifty-Tel, Inc. v. Bezenek, supra*, 46 Cal.App.4th at page 1565. At this juncture, we need not decide whether in these circumstances the cause of action should differ in any material respect from a traditional conversion action. (See generally Comment, *The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine, supra*, 1991 BYU L.Rev. 1681.) For purposes of ruling

---

[10] The Ninth Circuit requested a decision from the California Supreme Court on the question whether an Internet domain name was within the scope of property subject to the tort of conversion under California law, and on related questions concerning the "merger doctrine" articulated in the passage from *Thrifty-Tel, Inc. v. Bezenek, supra*, 46 Cal.App.4th at page 1565 quoted *ante*. (*Kremen v. Cohen* (9th Cir. 2003) 325 F.3d 1035, 1038; see Cal. Rules of Court, rule 8.548.) The California Supreme Court denied the request. (*Kremen v. Cohen, supra*, 337 F.3d at p. 1031.) Deciding the question for itself under California law, the Ninth Circuit discussed *Payne v. Elliot, supra*, 54 Cal. 339, *Olschewski v. Hudson, supra*, 87 Cal.App. 282, and other authorities. (*Kremen, supra*, 337 F.3d at pp. 1030–1033.) The Ninth Circuit ultimately stated that it need not decide whether California adheres to the merger doctrine because assuming that some degree of merger is required under California law, all that is required is "*some* connection to a document or tangible object." (*Id.* at p. 1033.) The Ninth Circuit concluded that an electronic database, an intangible document, associated the domain name with particular computers connected to the Internet and satisfied any merger requirement. (*Id.* at pp. 1033–1034.)

[11] "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property." (Civ. Code, § 654.)

on the demurrer, it is sufficient to conclude as we do that the misappropriation of intangible net operating losses alleged here supports a cause of action for conversion.

### 5. *Count Eleven Fails to Allege a Proper Cause of Action*

Indemnity alleges in count eleven that the alleged misappropriation of funds by Fremont General and Insurance Group was not fair and reasonable to Indemnity as required by Insurance Code section 1215.5. Indemnity seeks to recover "the full value of the assets misappropriated."

Insurance Code section 1215.5, part of the Insurance Holding Company System Regulatory Act, states among other things that the terms of transactions by insurers with their affiliates must be "fair and reasonable," that an insurer must notify the commissioner before entering into certain types of transactions, and that the commissioner may disapprove the transaction. (*Id.*, subds. (a)(1), (b), (d).) Insurance Code section 1215.10, subdivision (b) states that the commissioner, after notice and a hearing, may impose a civil monetary forfeiture on certain individuals who knowingly violate or permit a violation of the reporting requirement of section 1215.5. Section 1215.10, subdivision (c) states that if an insurer or any director, officer, employee, or agent of the insurer has "engaged in any transaction or entered into a contract which is subject to Section 1215.5 and which would not have been approved had approval been requested," the commissioner may order that insurer or individual to cease and desist any further activity under the transaction or contract. Section 1215.10, subdivision (c) states further that the commissioner, after notice and a hearing, "may also order the insurer to void any contracts and restore the status quo if this action is in the best interest of the policyholders, creditors, or the public."[12] Section 1215.9, subdivision (a) states that the commissioner may apply to the superior court to enjoin a violation of the act or any rule, regulation, or order by the commissioner under the act, and for other equitable relief.

Indemnity argues: "Insurance Code section 1215.10, subdivision (c) empowers the Commissioner to require insurers (Comstock and Fremont Indemnity) to void contracts that violate Insurance Code section 1215.5 and restore

---

[12] Insurance Code section 1215.10, subdivision (c) states in full: "Whenever it appears to the commissioner that any insurer subject to this article or any director, officer, employee, or agent thereof has engaged in any transaction or entered into a contract which is subject to Section 1215.5 and which would not have been approved had approval been requested, the commissioner may order the insurer to cease and desist immediately any further activity under that transaction or contract. After notice and hearing the commissioner may also order the insurer to void any contracts and restore the status quo if this action is in the best interest of the policyholders, creditors, or the public."

the status quo. This is precisely what the Commissioner seeks to do through the eleventh cause of action—he seeks to void the unfair transactions at issue, and seeks to restore Comstock and Fremont Indemnity to the status quo ante."

▇▇▇ Insurance Code section 1215.10, subdivision (c) authorizes the commissioner to order an insurer to cease and desist activity under a transaction or contract only if the insurer was required by Insurance Code section 1215.5 to notify the commissioner of the proposed transaction or contract but failed to do so, and only if the commissioner would not have approved the transaction or contract had approval been requested. This is the clear implication of the first sentence of section 1215.5, subdivision (c). The second sentence states that the commissioner "may also order the insurer to void any contracts and restore the status quo . . ." after notice and a hearing. We construe this to mean that in addition to issuing a cease-and-desist order in the circumstances described in the first sentence, the commissioner may also order the insurer to void any contracts and restore the status quo in those same circumstances. Thus, section 1215.10, subdivision (c) does not authorize the commissioner to void contracts and restore the status quo unless (1) the insurer was required by section 1215.5 to notify the commissioner of the proposed transaction or contract but failed to do so, and (2) the commissioner would not have approved the transaction or contract had approval been requested. The complaint does not allege that those were the circumstances here and therefore fails to state a cause of action under the statute.

▇▇▇ Moreover, Insurance Code section 1215.10, subdivision (c) provides for administrative enforcement of the Insurance Holding Company System Regulatory Act by authorizing the commissioner, after notice and a hearing, to order an insurer to void a transaction or contract and restore the status quo, but does not state that the commissioner may commence a judicial action seeking those remedies. Insurance Code section 1215.9, subdivision (a) authorizes the commissioner to apply to the superior court to enjoin a violation of the act or any rule, regulation, or order by the commissioner under the act, and for other equitable relief, but does not authorize the commissioner to commence a judicial action to void a transaction or contract or restore the status quo absent an actual or threatened violation of an order by the commissioner to that effect. Indemnity cites no statutory language and offers no legislative history indicating a legislative intent to create a cause of action by the commissioner to void a transaction or contract or restore the status quo absent such a prior order by the commissioner. Indemnity does not request leave to amend. The fact that the Insurance Holding Company System Regulatory Act creates a comprehensive scheme for administrative enforcement and a judicial remedy to enforce administrative action strongly suggests that the remedies provided are exclusive. (*Farmers Ins. Exchange v. Superior*

*Court* (2006) 137 Cal.App.4th 842, 850 [40 Cal.Rptr.3d 653].) We conclude that Indemnity has shown no prejudicial error in the sustaining of the demurrer to count eleven.

### 6. *The Sustaining of the Demurrer to Count Twelve Was Error*

Indemnity alleges in count twelve that Fremont General and Insurance Group made improper "distributions" of the assets of Comstock and Indemnity within the meaning of Insurance Code section 1215.16 by misappropriating funds in the manners alleged. Indemnity seeks to recover the alleged improper distributions.

Fremont General and Insurance Group argued in support of their demurrer and argue again on appeal that the term "distributions" as used in Insurance Code section 1215.16, subdivision (a) is limited to "the distribution of shares of stock or monetary bonuses." Section 1215.16, subdivision (a) states that the receiver under an order for liquidation or rehabilitation of a domestic insurer may recover from any parent corporation, holding company, or other controlling person or affiliate "the amount of distributions other than distributions of shares of the same class of stock paid by the insurer on its capital stock," or "any payment in the form of a bonus, termination settlement, or extraordinary lump sum salary adjustment made by the insurer or its subsidiary to a director, officer, or employee," provided that the distribution or payment was made within one year before the petition for liquidation, conservation, or rehabilitation. Section 1215.16, subdivision (b) states that the receiver cannot recover a distribution if the parent or affiliate shows that the distribution was lawful and reasonable when it was paid, "and that the insurer did not know and could not reasonably have known that the distribution might adversely affect the ability of the insurer to fulfill its contractual obligations."

The statute refers to "distributions" rather than "distributions of shares of stock," and the statutory language does not suggest that the term "distributions" is limited to only distributions of shares of stock. Moreover, the apparent purpose of the provision to allow the receiver to recover assets conveyed unreasonably to a parent corporation or other controlling person or affiliate suggests that the Legislature did not intend such a restrictive meaning of the term "distributions" as the defendants suggest. In support of their demurrer, the defendants cited a legislative committee analysis stating that the bill "Authorizes receivers for insolvent insurers to recover from holding companies and affiliates distributions of shares, and bonuses or other extraordinary salary adjustments . . . ." (Assem. Com. on Ins., Analysis of Sen. Bill No. 1666 (1991–1992 Reg. Sess.) as amended June 16, 1992, p. 4.) They also cited an enrolled bill report stating, "This bill authorizes receivers for

insolvent insurers to treat distributions to holding company employees of shares and bonuses or other extraordinary salary adjustments by the insolvent insurer . . . as a fraudulent conveyance . . . ." (Off. of Ins. Advisor, Enrolled Bill Rep. on Sen. Bill No. 1666 (1991–1992 Reg. Sess.) Aug. 12, 1992, p. 3.)[13] We do not view these brief summaries as comprehensive statements of the intent of the statute. Moreover, although legislative history can help to disclose the intent of the Legislature when a statute is unclear or ambiguous, the statutory language is the primary indication of legislative intent. (*S. B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379 [46 Cal.Rptr.3d 380, 138 P.3d 713].) Absent some indication in the language of the statute that the term "distributions" was intended to mean only "distributions of shares of stock," we will not construe the statute so restrictively.

### 7. *Other Reasons Asserted in the Demurrer Do Not Support the Sustaining of the Demurrer*

Fremont General and Insurance Group argued as an independent basis for their demurrer to counts one (declaratory relief), two (permanent injunction), and three (breach of contract) that even absent the letter agreement, Fremont General had a fiduciary obligation to use Comstock's net operating losses to offset the taxable income of other affiliated companies. They argued that Indemnity was not entitled to compensation for that use because Indemnity had no taxable income and therefore could not benefit from its own use of the net operating losses. The factual premise that Indemnity had no taxable income is not alleged in the complaint and is contrary to the allegation in the complaint that Indemnity "remains a taxpayer." We therefore cannot affirm the sustaining of the demurrer to counts one, two, and three on this basis.

Fremont General and Insurance Group argued as an independent basis for their demurrer to counts eight (avoidance of fraudulent transfers), nine (avoidance of voidable preferences), and ten (avoidance of fraudulent transfers) that those counts are not pled with the specificity required for a cause of action based on a statute. They neglected to argue either in the trial court or on appeal in what manner the complaint fails to allege the elements required to establish a right to relief under the applicable statutes. Absent specific argument on this point, we perceive no pleading deficiency and cannot affirm the demurrer to those counts on this basis.

Fremont General and Insurance group made various other arguments in support of their general demurrer that would not dispose of an entire cause of action and therefore cannot support the sustaining of the demurrer to any count. We express no opinion concerning the parties' respective legal arguments on those issues.

---

[13] We take judicial notice of the two items of legislative history, which were submitted to the trial court with a request for judicial notice in the NOL action.

## *DISPOSITION*

The judgment is reversed with directions to the superior court to (1) vacate its order sustaining the demurrer without leave to amend to each count alleged in the complaint, and (2) enter a new order sustaining the demurrer without leave to amend as to count eleven only and overruling the demurrer as to the other counts. Indemnity is entitled to recover its costs on appeal.

Kitching, J., and Aldrich, J., concurred.