Filed 3/20/26  Caglia Environmental v. City of Selma CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CAGLIA ENVIRONMENTAL LLC, Plaintiff and Appellant, v. CITY OF SELMA et al., Defendants and Respondents; MID-VALLEY DISPOSAL, LLC, Real Party in Interest and Respondent. | F087968, F088647 (Super. Ct. No. 23CECG04734) **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County.  Robert M Whalen, Jr., Judge.

Wanger Jones Helsley, John P. Kinsey and Hunter C. Castro for Plaintiff and Appellant.

Costanzo & Associates and Neal E. Costanzo for Defendants and Respondents.

Quall Cardot, Matthew W. Quall and G. Andrew Slater for Real Party in Interest and Respondent.

-ooOoo-

## INTRODUCTION

Caglia Environmental LLC (Caglia), a waste management company, competed with other waste management companies for a contract to provide the City of Selma (City) with integrated waste management services. The exclusive right to negotiate the contract with City, and ultimately the contract itself, was awarded to another competitor, Mid-Valley Disposal, LLC (Mid-Valley).

Caglia filed a combined petition for writ of mandate and complaint for damages and other relief against City and the City Council of the City of Selma (City Council) (collectively, City defendants) alleging, in part, that Caglia was the "lowest responsible bidder" for the contract and that City defendants were under a mandatory duty to award the contract to Caglia. Mid-Valley was added to the litigation as a real party in interest. City defendants and Mid-Valley (together, respondents) ultimately prevailed in the action after successfully demurring to Caglia's First Amended Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (FAP) and Caglia's Second Amended Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (SAP).

On appeal, Caglia challenges orders of the Fresno County Superior Court (1) sustaining respondents' demurrers to the FAP; (2) sustaining respondents' demurrers to the SAP; and (3) denying Caglia's application for a temporary restraining order (TRO) and order to show cause (OSC) as to why a preliminary injunction should not issue (TRO/OSC Application).

We dismiss the appeal of the order denying Caglia's TRO/OSC Application as moot, reverse in part and affirm in part the order sustaining respondents' demurrers to the FAP, affirm the order sustaining respondents' demurrers to the SAP without leave to amend, and remand the matter for further proceedings.

2.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Overview of Superior Court Filings and Proceedings**

On November 14, 2023, Caglia filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief (original petition) against City defendants and Does 1 through 50.  The original petition challenged, and sought relief in connection with, City's selection of Mid-Valley to enter into exclusive negotiations with City for an award of a franchise agreement to provide City with integrated waste management services (waste management contract).  City selected Mid-Valley after obtaining proposals or bids from Caglia, Mid-Valley, and other waste management companies in response to a request for proposal (RFP) issued by City.

*A.      The RFP*

The RFP was attached to each of Caglia's writ petitions (i.e., the original petition, FAP and SAP).  The RFP included City's "Notice of Availability of Request for Proposals …" (boldface & some capitalization omitted) in which City "request[ed] technical and cost proposals for:  (1) the collection, transfer, processing, recycling, and disposal of cart-served residential refuse, and bin-served residential, commercial sector refuse, and recurring and temporary roll-off service; (2) the collection, processing, and marketing of residential and commercial sector recyclables; and (3) the collection, processing, and acceptable landfill diversion of residential and commercial organic waste in a manner that is compliant with AB 341,[1] AB 1826[2] and all relevant SB 1383[3] regulations.  Included with these specific technical services[,] the successful proposer should be able to demonstrate how their proposed services will satisfy each applicable [Senate Bill] 1383 regulation."

---

**1**      Assembly Bill No. 341 (2011–2012 Reg. Sess.).

**2**      Assembly Bill No. 1826 (2013–2014 Reg. Sess.).

**3**      Senate Bill No. 1383 (2015–2016 Reg. Sess.) (Senate Bill 1383).

City, through its RFP, sought proposals from "qualified sold waste and recycling companies" to provide waste management services "for a period of seven (7) years, with a [City] option to extend services three (3) additional years (10 years total)" and requested that "responding firms provide guaranteed processing/diversion capacity for organic wastes for the term" of the waste management contract.

The RFP set a schedule for its procurement process which included dates and deadlines for a mandatory pre-proposal conference, the submission of proposals, interviews of selected proposers, the selection of a single proposer, the finalization of the waste management contract, and recommendations to the City Council. The RFP stated, "City's rights include, but are not limited to, the following: [¶] … [¶] reject all proposals and accept or reject all or any part of any proposal[;] [¶] discontinue its negotiations after commencing negotiations with a proposer if progress is unsatisfactory in the judgement [sic] of [City] and commence discussions with another qualified proposer[; and] [¶] reissue or modify the RFP." (Some capitalization omitted.)

The RFP required all responses to the RFP to include, without limitation, the firm's "relevant experience" in "all the identified service areas in Section 3 [of the RFP], Discarded Materials Management Services." Under said Section 3, "[a] proposer must demonstrate experience in all the following required areas to be deemed qualified": "Services provided"; "Legal requirements"; "Reporting and compliance with local, state, and federal mandates"; "Indemnification (CERCLA[4] and AB 939[5])"; "Collection equipment"; "Special wastes (construction and demolition wastes, tires, and bulky items)"; "Transfer station and diversion facilities capabilities"; and "Organic waste and landfill disposal capacity." The RFP provided additional detail for each required area. In

---

[4]      CERCLA is an acronym for the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq).

[5]      Assembly Bill No. 939 (1989–1990 Reg. Sess.).

addition, the RFP allowed bidders or proposers the option of providing "bid alternates" for residential and commercial sector waste collection. That is, a bidder or proposer was permitted to suggest and advocate for alternative "1, 2 and/or 4 container 'standard compliance' approach programs, and … 'performance-based' compliance approach programs" to service residential and/or commercial customers in lieu of, or in addition to, City's preferred "3-container [Senate Bill] 1383 'standard compliance' approach program."[6]

The RFP discussed the evaluation and selection criteria City would use "in selecting the most qualified and responsible firm who can best serve the residents, businesses, and interests of [City]." The RFP further stated, "Price will be an important criterion, but [City] reserves the right to select a service provider that presents the best qualifications but not necessarily at the lowest price." The RFP further stated, "Based on the results of the evaluation process, with priority given to pricing, the number and type of exceptions taken, and technical merits of the proposer, and the other key decision points list [in the RFP], [City] will then negotiate and finalize execution of the [waste management contract] with the firm whose RFP response is deemed best."

## B.  The FAP, Related Demurrers, and Order Sustaining Same

On December 22, 2023, after City awarded the waste management contract to Mid-Valley following exclusive negotiations and during pendency of the litigation, Caglia filed its FAP and added Mid-Valley and Roes 1 through 10 as real parties in interest. In its FAP, Caglia contended City defendants failed to comply with Selma Municipal Code section 8-1-11[7] when it selected Mid-Valley to engage in the exclusive

---

[6]  City's preferred "3-container 'standard compliance' approach" called for residential and commercial customers to be supplied with three containers: one container for nonorganic waste disposal, a second container for nonorganic recyclables and limited types of organic wastes, and a third container for organic waste.

[7]  All citations to the "Municipal Code" are to the Selma Municipal Code unless otherwise indicated.

negotiations for the waste management contract. Municipal Code section 8-1-11 provides in relevant part: "Each [waste management] contract may be let to such responsible persons as the council may see fit, or be let on bids, and if let on bids, sealed bids shall be called for by the council and the contract awarded to the lowest responsible bidder. Each proposal or bid shall be accompanied by a certified check, payable to [City], in the sum of one thousand dollars ($1,000.00) which sum shall be forfeited to [City] if the bidder to whom is awarded the contract shall fail or refuse to enter into the contract within ten (10) days after the date of mailing to the successful bidder the 'notice of award of contract'. The [City Council] reserves the right to reject any and all bids."

In its FAP, Caglia contended that when City issued the RFP and proceeded with the RFP process, it engaged in the bidding process contemplated by Municipal Code section 8-1-11 and was required to award the waste management contract to the lowest responsible bidder and/or to "select the lowest responsible bidder to engage in exclusive negotiations for the [waste management contract]." Caglia alleges it was the lowest responsible bidder.

In its first cause of action, Caglia contended City defendants were under "a mandatory duty to select [Caglia] as the winning bidder for the [waste management contract]," sought a writ of mandate "pursuant to Sections 1085 and 1094.5 of the Code of Civil Procedure,[8] and the Court's inherent equitable powers, to invalidate [City defendants'] selection of Mid-Valley and direction to City staff to engage in exclusive [waste management contract] negotiations with Mid-Valley," to "invalidate [City defendants'] award of the [waste management contract] to Mid-Valley," and to order City defendants "to select [Caglia] as the lowest responsible bidder to the RFP, direct City staff to engage in exclusive [waste management contract] negotiations with [Caglia], and award the [waste management contract] to [Caglia]."

---

8      Undesignated statutory references are to the Code of Civil Procedure.

In its second cause of action, Caglia sought a writ of mandate for the same relief, contending City defendants "violated [Caglia's] right to substantive due process by, among other things, selecting Mid-Valley for perceived personal cost savings" that would be realized by two City Council members who voted to select Mid-Valley. Caglia contended City defendants' decision declining to select Mid-Valley for exclusive waste management contract negotiations "was conducted 'for the purpose of oppression,' amounting to an 'abuse of governmental power that shocks the conscience,' and was 'legally irrational in that it is not sufficiently keyed to any legitimate state interest.' " Caglia contended it "has a clear, present, and legal right with respect to the requirement that [City defendants] act in a manner that is not arbitrary and provide [Caglia] a fair hearing," City defendants "failure to comply with applicable law will cause irreparable harm to [Caglia], and the public at large," and it has "[n]o other adequate legal remedy … to redress the harm."

Caglia's third cause of action was for declaratory relief and sought a judicial declaration that (1) Mid-Valley's RFP submission "did not comply with all of the requirements of the RFP and [Municipal Code]"; (2) Caglia's RFP submission did so comply; (3) City defendants were required under Municipal Code section 8-1-11 to select Caglia as the "winning bidder for the [waste management contract] and exclusive negotiations therefor" because it was the lowest responsible bidder; (4) City defendants "lacked discretion to select Mid-Valley for exclusive [waste management contract] negotiations"; (5) City defendants "violated their mandatory and ministerial duties under the [Municipal Code]"; (6) City defendants must rescind their selection of Mid-Valley for exclusive contract negotiations and their award of the waste management contract to Mid-Valley; and (7) City defendants "must perform their mandatory and ministerial duties … to identify [Caglia] as the lowest responsible bidder, direct City staff to engage in exclusive contract negotiations to finalize a [waste management contract] with [Caglia], and to confirm the [c]ontract with [Caglia] that results therefrom."

In its fourth and final cause of action, Caglia sought a TRO, preliminary injunction, and permanent injunction ordering City defendants "to comply with the [Municipal Code's] provisions … and to refrain from proceeding with a [waste management contract] award to Mid-Valley and work thereon."

Caglia attached 13 exhibits to the FAP including, without limitation, copies of the following documents, which were alleged to be true and correct copies: (1) the RFP (exhibit A); (2) the scoring sheet developed and used by the selection committee appointed to review and score responses to the RFP, which allocated a certain number of points to each criterion utilized in the selection process (exhibit F); (3) the recommendation of the third party consultant hired by City to advise City Council as to which waste hauler should be selected to enter into exclusive negotiations for the waste management contract (exhibit H); and (4) correspondence between counsel for City and counsel for Caglia outlining their respective positions concerning the selection of Mid-Valley (exhibits J–L).[9]

On February 5, 2024, City defendants demurred to all causes of action in the FAP for "failure to state a cause of action pursuant to … section 430.10[, subdivision (e)]." On that same date, Mid-Valley demurred to each cause of action in the FAP on essentially the same ground, described by Mid-Valley as follows: (1) as to the first cause of action, that "the [waste management] contract was awarded by [] City pursuant to a

_____

[9] Additional exhibits to the FAP include the following: (a) a copy of City's "Bid Opportunities" webpage as it appeared on November 13, 2023 (exhibit B); (b) Title VIII, chapter 1 of the Municipal Code titled "GARBAGE REGULATIONS" (exhibit C); (c) a copy of the business checking account check submitted by Mid-Valley to City in connection with its bid/proposal (exhibit D); (d) a copy of City's special meeting agenda for August 15, 2023, study session for "Consideration and Review of Integrated Waste Management Services Proposals" (exhibit E); (e) City's "STAFF'S REPORT" dated August 21, 2023 (exhibit G); City's "STAFF'S REPORT" dated September 5, 2023 (exhibit I); and (f) City agendas for a December 4, 2023 special meeting and a December 4, 2023 regular meeting at which City Council was to consider a resolution to approve the waste management contract with Mid-Valley (exhibit M).

request for proposals, not a request for bids. Thus, [Caglia] cannot show a failure to proceed in a manner required by law"; (2) as to the second cause of action, it "fails to state a cause of action for substantive due process" because (a) Caglia "was not the lowest responsive, responsible bidder for the project," (b) Caglia's "proposal was in violation of Proposition 218[10] in that it allocated costs above those incurred," and (c) "there was no conflict of interest as to [] City Council"; (3) as to the third cause of action, that "declaratory relief cannot be used to attack an adjudicatory or 'quasi-judicial' decision by an agency; and as the previous causes of action upon which it is dependent are deficient"; and (4) as to the fourth cause of action, that it "fails as it is entirely dependent upon the validity of the other three causes of action, which as shown above are deficiently [pleaded,] and the cause of action is moot as the [waste management] contract has already been awarded by [] City to [Mid-Valley]."

On February 29, 2024, Caglia filed oppositions to both demurrers. On March 13, 2024, the trial court heard argument on both demurrers and took the matter under advisement.

On May 20, 2024, the trial court issued its decision on the demurrers to the FAP (the May 2024 Order). It sustained the demurrers on Caglia's first, third, and fourth causes of action without leave to amend and sustained the demurrer on Caglia's second cause of action with leave to amend.

---

**10** Proposition 218, approved by California voters in November 1996, added articles XIII C and XIII D to the California Constitution. "Proposition 218 limited local government's ability to impose real property assessments in two significant ways. An assessment can be imposed only for a 'special benefit' conferred on real property ([Cal. Const., ]art. XIII D, § 2, subd. (b)), and the assessment on any parcel must be in proportion to the special benefit conferred on the particular parcel. ([Cal. Const., ]art. XIII D, § 4, subd. (a).)" (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 437, fn. omitted.) "Proposition 218 also imposed restrictions on the imposition of fees and charges for property-related services …." (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 260, fn. 3; see Cal. Const., art. XIII D, §§ 3, subd. (a)(4), 6.)

With regard to Caglia's second cause of action, the court observed that Caglia's substantive due process cause of action alleged "concerns raised by Council Members about the impact of [Senate Bill] 1383[11] on the restaurants in town, including some owned by the very Council Members voting on who should be awarded the exclusive right to contract. While it is axiomatic all Council Members are citizens of [] City … and, therefore, would be making a decision on rates which would be impacting their personal finances, [Caglia] direct[s] special attention to two Councilmembers who also own restaurants in town. Indeed, the [FAP] alleges those Councilmembers did not shy away from making known to the public how they vote would be informed by how the commercial rates or their [Senate Bill] 1383 concerns would be addressed by the proposals." (Fns. omitted.) The court then wrote, "Despite the [FAP] making these allegations[,] there does not appear to be a nexus between these factual allegations and the claim the public discussions violated the due process rights of [Caglia]. Therefore, on this Second Cause of Action[,] the demurrer is sustained, but with leave to amend so [Caglia] can more clearly identify the nexus between the comments made by [City] Council Members and the alleged due process violations."

## C. TRO/OSC Application and the Trial Court's Order Denying Same

On February 2, 2024, a few days before respondents filed their respective demurrers to the FAP, Caglia filed its TRO/OSC Application. In it, Caglia sought to enjoin City defendants "from (i) entering into the [waste management contract] awarded to Mid-Valley on December 4, 2023; and/or (ii) transitioning integrated waste disposal services to Mid-Valley pending the resolution" of the litigation.

---

**11** In a footnote, the trial court wrote the following with respect to Senate Bill 1383: "Approved by the Governor September 19, 2016[,] this legislation addresses the regulatory framework associated with significantly increasing the amount of organic waste being recycled."

Caglia's TRO/OSC Application was made "on the grounds that Section 40059 of the Public Resources Code[12] and [Municipal Code] section 8-1-11 require [City defendants] to award contracts for the collection and disposal of City waste to the lowest responsible bidder if [] City engages in a bidding process" and City defendants failed to comply with those authorities and "abused their discretion" by selecting Mid-Valley to exclusively negotiate for the waste management contract and by awarding the waste management contract to Mid-Valley.

In its TRO/OSC Application, Caglia stated it was the "incumbent provider of recycling processing services in [] City, and the Mid-Valley [waste management contract] contemplates Caglia will no longer provide those services as of July 1, 2024." Caglia's attorney clarified at oral argument that Waste Management, a third party waste management company (Waste Management Company), is the primary contractor for collection and disposal or recycling of waste and recyclables, and that Caglia is a subcontractor to Waste Management Company for the handling of recyclables.) Caglia contended it would be harmed not just by a significant "loss of revenue," but also because it would need to "demobiliz[e] … and remobilize its fleet if successful in this action."

Caglia contended City would not be harmed by a TRO and preliminary injunction because, under the status quo, Caglia would continue providing recycling services and Waste Management Company "is providing and will continue to provide refuse

---

**12** Public Resources Code section 40059, subdivision (a) provides: "Notwithstanding any other provision of law, each county, city, district, or other local governmental agency may determine all of the following: [¶] (1) Aspects of solid waste handling which are of local concern, including, but not limited to, frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing solid waste handling services. [¶] (2) Whether the services are to be provided by means of nonexclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding, or if, in the opinion of its governing body, the public health, safety, and well-being so require, by partially exclusive or wholly exclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding. The authority to provide solid waste handling services may be granted under terms and conditions prescribed by the governing body of the local governmental agency by resolution or ordinance."

11.

collection services" for City residents and businesses. Caglia contended it was "prepared to advance [its] claims … and proceed to trial as expeditiously as possible" and that Mid-Valley would "not suffer harm unless delays result from any conduct of [City defendants] in litigating this case."

Caglia argued that absent issuance of a TRO and OSC, City residents and businesses would be harmed due to a disruption of services and changes in billing and billing practices that would occur if Mid-Valley were permitted to perform under the new waste management contract and Caglia ultimately succeeds in the litigation. In addition, Caglia contended Mid-Valley will charge residential customers a higher rate than Caglia, which will result in residential customer confusion and the possible need for City defendants "having to refund residential customers if this action is successful."

On February 28, 2024, the trial court heard arguments on Caglia's TRO/OSC Application. After oral arguments concluded, the trial court ruled from the bench and denied the TRO/OSC Application. A minute order to that effect issued that same day. On March 1, 2024, the court entered a formal order to that same effect. (Collectively, the February 28, 2024 and March 1, 2024 orders are referred to as the TRO/OSC Order.)

### D.	The SAP, Related Demurrers, and Order Sustaining Same

On May 30, 2024, Caglia filed its SAP. It added general allegations concerning two voting City Council members' ownership of restaurants in City and allegations on information and belief that a City Council member's vote to select Mid-Valley to enter into exclusive negotiations with, and to award the waste management contract to, Mid-Valley was procured by economic threats from another City Council member. In amending their substantive due process claim, Caglia alleged, among other things, that City Council members allowed their personal biases to influence them and considered their own personal financial interests and "regulatory compliance support" (boldface & underlining omitted) they would receive in voting to select Mid-Valley. Caglia also

12.

added a second cause of action for common law bias premised on the same or similar allegations.

On June 28, 2024, respondents filed separate demurrers to the SAP. City defendants demurred to all causes of action on grounds the SAP failed to state a cause of action pursuant to section 430.10, subdivision (e). Mid-Valley demurred to the first cause of action for an alleged violation of substantive due process on grounds "Caglia has not pled facts sufficient to meet the high burden to establish a violation of substantive due process and because no City Councilmember was subject to a conflict of interest as alleged." Mid-Valley demurred to the second cause of action for common law bias on grounds Caglia "was not granted leave to add a new cause of action," the "cause of action lacks a statutory basis," and the "cause of action is merely duplicative of the first cause of action."

On July 11, 2024, Caglia filed oppositions to both demurrers. On July 24, 2024, the trial court heard oral arguments in support of, and opposition to, the demurrers.

On July 24, 2024, the trial court issued a law and motion minute order sustaining both demurrers without leave to amend. On August 21, 2024, the court entered a formal order sustaining both demurrers. (Collectively, the July 24, 2024 minute order and subsequent August 21, 2024 formal order are referred to as the August 2024 Order.) The court concluded Caglia "failed to show the nexus between the allegations … in its [SAP] and its allegations that it was denied substantive due process" "failed to state facts to constitute a proper cause of action," "has not established and gives no indication that it can establish the [aforementioned] nexus," and does not "claim that relevant, yet unpled facts exist." The court also determined Caglia's common law bias claim "was brought improperly" because the court did not grant Caglia leave to add the cause of action and "the cause of action substantively failed to state a proper cause of action."

13.

**II.    Interim Appellate Proceedings, Status of Superior Court Litigation, and Notices of Appeal**

*A.    Superior Court Case Status*

The Fresno Superior Court's register of actions/case information lists the case status as "[j]udgment."  However, no formal judgment appears to have been entered in the litigation.

*B.    Caglia Appealed the Order Denying Its TRO/OSC Application, and Petitioned the Appellate Court for a Writ of Supersedeas and Other Appropriate Relief*

On April 29, 2024, Caglia filed a timely notice of appeal to challenge the TRO/OSC Order.  The case was assigned appellate case No. F087968.

On May 8, 2024, Caglia filed a petition for writ of supersedeas and for other appropriate relief in case No. F087968.  In it, Caglia requested this court issue a stay enjoining City defendants to refrain from entering into the waste management contract with Mid-Valley and/or from "transitioning integrated waste disposal services to [Mid-Valley] pending the resolution of the underlying [Fresno Superior Court] action."  On June 7, 2024, this court summarily denied the petition for writ of supersedeas and other appropriate relief.

*C.    Appeal of the May and August 2024 Orders, and Consolidation of the Appeals*

On September 13, 2024, Caglia filed a timely notice of appeal to challenge the May and August 2024 Orders.  The case was assigned appellate case No. F088647.  On October 14, 2024, all parties stipulated and moved this court for an order consolidating the aforementioned appeals (i.e., appellate cases Nos. F087968 & F088647).  We granted the parties' joint motion, consolidated the appeals, and designated appellate case No. F087968 as the lead case.

Additional facts and factual allegations are detailed, as necessary, in the discussion of this opinion.

## DISCUSSION

### I.  Whether the Trial Court's Orders Are Appealable or Moot

We address a threshold issue raised by respondents—whether the challenged orders are appealable or moot.  As discussed below, we conclude the May and August 2024 Orders are appealable.  We further conclude below that the appeal of the TRO/OSC Order has been rendered moot by the occurrence of subsequent events and, consequently, we will dismiss the appeal of the TRO/OSC Order.

#### A.  *The May and August 2024 Orders Are Appealable*

Respondents contend the May and August 2024 Orders sustaining respondents' respective demurrers to the FAP and SAP are not appealable due to the lack of an order of dismissal, i.e., a final judgment.  Respondents are correct.  However, as discussed below, this court may, under certain circumstances, deem such orders as including an order of dismissal.  Those circumstances are present here.

"An order sustaining a demurrer without leave to amend is not appealable, and an appeal is proper only after entry of a dismissal on such an order.  [Citations.]  On occasion, however, appellate courts have reviewed such orders, based upon justifications such as the avoidance of delay, the interests of justice, and the apparent intent of the trial court to have a formal judgment filed.  [Citation.]  And when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment."  (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396; see *Hedwall v. PCMV, LLC* (2018) 22 Cal.App.5th 564, 570–571 [where rulings on a demurrer and a motion for judgment on the pleadings resolved all claims as to one of several cross-defendants but no final judgment issued due to the continued pendency of litigation as to other parties, to promote judicial economy, it was "appropriate to amend the rulings to include such a judgment, rather than dismiss the appeal"].)

15.

Here, the trial court's rulings on demurrer resolved all claims asserted in the litigation. The register of actions shows the case status as "judgment" even though no judgment was issued—an indication that the trial court considered the matter fully and finally adjudicated. Under these circumstances and to avoid delay and promote judicial economy, it is appropriate to deem the August 2024 Order as including a judgment of dismissal. We do so now.

## B.     The Appeal of the TRO/OSC Order Is Moot

In its TRO/OSC Application, Caglia sought to enjoin City defendants from "(i) entering into the [waste management contract] awarded to Mid-Valley on December 4, 2023; and/or (ii) transitioning integrated waste disposal services to Mid-Valley pending the resolution" of Caglia's claims.

Respondents contend the issue is moot—albeit, for different reasons.[13] Mid-Valley contends the issue is moot because City awarded the waste management contract to Mid-Valley, Mid-Valley "started work under the [waste management contract] on July 1, 2024," and "all transitioning of the performance of waste management services has been completed." Caglia contends Mid-Valley should not have focused on the foregoing issues and should have, instead, focused on Caglia's requests in connection with its mandamus claims—i.e., its requests to rescind City Council's votes selecting Mid-Valley and to reconduct the RFP process. Caglia contends, "[Mid-Valley's] assumption of services under the [waste management contract] and the removal of Mayor Pro Tem Cho[14] from [] City's legislative body do not create a bar to future orders that

---

[13]     City defendants contend the issuance of a final judgment has rendered the appeal moot. Because we are reversing the May 2024 Order in part, the premise of City's argument no longer exists. However, as discussed *post*, we are persuaded by Mid-Valley's argument that the appeal of the TRO/OSC Order is moot.

[14]     Mid-Valley requests this court take judicial notice of the fact that Mayor Pro Tem Beverly Cho (one City Council member who voted to award the waste management contract to Mid-Valley) is no longer the Mayor Pro Tem and not a member of City Council. Mid-Valley contends this fact is relevant because Caglia seeks to disqualify Cho from participating in the

16.

carry out the spirit of [Caglia's] [mandamus] requests." We conclude Mid-Valley has the better argument.

" 'It is well settled that an appellate court will decide only actual controversies. Consistent therewith, it has been said that an action which originally was based upon a justiciable controversy cannot be maintained on appeal if the questions raised therein have become moot by subsequent acts or events.' [Citation.] These principles apply to appeals of orders denying preliminary injunctions. [Citation.] 'An appeal from an order denying an injunction may be dismissed as moot if the act sought to be enjoined is performed while the appeal is pending.' " (*Cerletti v. Newsom* (2021) 71 Cal.App.5th 760, 765–766.)

Caglia has effectively conceded that the waste management contract was awarded to Mid-Valley and that Mid-Valley has been rendering services to City businesses and residents under the contract since July 1, 2024. This is the very conduct Caglia sought to enjoin—i.e., the award of the waste management contract and the transitioning of integrated waste disposal services to City. Thus, subsequent events have mooted the TRO/OSC issue,[15] and, on that ground, we dismiss the appeal of the TRO/OSC Order.[16]

---

contract award in the event it prevails on appeal. We deferred ruling on Mid-Valley's request pending consideration of the appeal on its merits. No party has objected to the request. We grant the request but do not rely on it in reaching our decision.

[15]     In connection with its appeal of the TRO/OSC Order, Caglia requests this court take judicial notice of "City of Selma Resolution No. 2014-1R Ratifying the Amended and Restated Solid Waste and Recycling Franchise Agreement between the City of Selma and Selma Disposal and Recycling, LLC, for Solid Waste Collection, Green Waste Collection, and Recycling Services," dated November 1, 2013. Caglia observes the agreement has a provision providing for the extension of existing waste services beyond the agreement's termination date of July 1, 2024. (At the hearing on the TRO/OSC Application, Caglia's counsel represented to the trial court that Waste Management Company was City's then current waste management service provider—not Selma Disposal and Recycling, LLC. No explanation is provided for the discrepancy.) In any event, because the appeal of the TRO/OSC Order is moot, we deny the request for judicial notice.

[16]     Nothing in this opinion should be interpreted as precluding the trial court from granting future injunctive relief upon a proper application and showing.

## II.     Appeal of the May 2024 Order

Caglia challenges the May 2024 Order to the extent the trial court sustained demurrers to its first, second, and third causes of action in the FAP.  Caglia does not challenge the order to the extent the court sustained demurrers to the fourth cause of action in the FAP for injunctive relief.  Consequently, we will affirm the May 2024 Order's disposition of Caglia's fourth cause of action for injunctive relief.  In addition, as discussed below, we reverse the May 2024 Order to the extent the court sustained the demurrer to Caglia's first cause of action in the FAP and affirm the order to the extent the court sustained the demurrer to Caglia's third cause of action in the FAP.  We will review Caglia's second cause of action, which was amended in the SAP, in a subsequent section of this opinion in connection with Caglia's appeal of the August 2024 Order.

### A.     *Standard of Review*

"A respondent may test the legal sufficiency of a petition for writ of mandate by demurrer.  [Citation.]  On appeal from an order of dismissal after a demurrer is sustained without leave to amend, our review is de novo.  [Citation.]  In performing our independent review of the complaint, we assume the truth of all facts properly pleaded by plaintiff.  [Citation.]  [¶]  Further, 'we give the complaint a reasonable interpretation, and read it in context.'  [Citation.]  But we do not assume the truth of ' " 'contentions, deductions or conclusions of fact or law.' " ' [Citation.]  We also consider matters that may be judicially noticed .…"  (*Committee for Sound Water & Land Development v. City of Seaside* (2022) 79 Cal.App.5th 389, 399–400.)  "The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken.' "  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

" 'When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse;

if not, there has been no abuse of discretion and we affirm.' " (*Herron v. San Diego Unified Port Dist.* (2025) 109 Cal.App.5th 1, 7.)

**B.      Caglia's First Cause of Action in the FAP—Writ of Mandate Based on Alleged Failure to Proceed in the Manner Required by Law**

*1. The Trial Court Erred by Interpreting the RFP on Demurrer*

Caglia contends the trial court erred by interpreting the RFP under the "guise of taking judicial notice of the document" and, in doing so, "incorrectly concluded [] City validly made a direct award to [Mid-Valley] because it did not engage in a competitive bidding process that required the selection of the lowest responsible bidder." Caglia states the court's determination was made without the benefit of a certified administrative record and contends the determination "was inappropriate at the demurrer stage."

Respondents contend the trial court properly took judicial notice of the RFP and argue the court's determination is supported by the language of the RFP, which demonstrates it was a request for proposals and not a request for bids. Respondents contend the RFP is not reasonably susceptible to an alternative construction. Mid-Valley also contends Caglia "did not allege sufficient facts to demonstrate that it was the lowest responsible bidder."

We conclude Caglia's argument has merit.[17]

Caglia's first cause of action in the FAP was premised on Caglia's contention that, when City issued the RFP, it initiated a competitive bidding process for the waste management contract. Caglia alleged it was the lowest responsible bidder and that City was under a mandatory and ministerial duty to award the exclusive right to negotiate the waste management contract to Caglia pursuant to Municipal Code section 8-1-11, which provides in relevant part: "Each [waste management] contract may be let to such responsible persons as the council may see fit, or be let on bids, and if let on bids, sealed

---

[17]      In so concluding, we express no opinion on the proper interpretation of the RFP.

19.

bids shall be called for by the council and the contract awarded to the lowest responsible bidder."

The trial court stated its charge on demurrer as follows: "In deciding whether to sustain the Demurrer to the First Cause of Action[,] this court must consider whether the [RFP] was designed to assist the Council in determining a 'responsible person' who they 'see fit' to provide integrated waste management services for [] City or the [RFP] was a 'bid.' " (Fn. omitted.) In performing this charge, the court wrote, "[T]he allegations of the complaint are not accepted as true if they contradict or are inconsistent with facts judicially noticed by the court." The court said it was taking judicial notice of the exhibits to the FAP (including the RFP) and went on to interpret the RFP, concluding it did not initiate a competitive bidding process, and City had, instead, initiated a process by which City was authorized to award the right to negotiate the waste management contract to the responsible person whom City defendants saw fit. As a result, the court sustained respondents' demurrers to the first cause of action in the FAP.

In *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97 (*Fremont*), the plaintiff brought numerous causes of action against its parent companies alleging the defendants "misappropriated net operating losses of [the plaintiff's] predecessor-in-interest … and misappropriated other assets of [the plaintiff's] former subsidiary." (*Id.* at pp. 103, 105–106.) The defendants demurred, and the trial court, at the defendants' request, took judicial notice of a July 2, 2002 letter agreement and determined it "allowed [one of the defendants] to use the net operating losses in the manner alleged." (*Id.* at pp. 103, 106.) The court sustained the demurrer without leave to amend and entered a judgment of dismissal. (*Id.* at pp. 109–110.) On appeal, the appellate court concluded the trial court "erred by taking judicial notice of the enforceability and proper interpretation of the letter agreement and by deciding those questions in ruling on the demurrer." (*Id.* at p. 103.) The *Fremont* court wrote, "A matter ordinarily is subject to judicial notice only if the matter is reasonably beyond

20.

dispute. [Citation.] Although the *existence* of a document may be judicially noticeable, the truth of statements contained in the document and its proper interpretation are not subject to judicial notice if those matters are reasonably disputable." (*Id.* at p. 113.)

"The proper interpretation of a contract is disputable if the contract is susceptible of more than one reasonable interpretation, that is, if the contract is ambiguous. An ambiguity may appear on the face of a contract, *or extrinsic evidence may reveal a latent ambiguity*. [Citation.] A court determining whether a contract is ambiguous must first consider extrinsic evidence offered to prove the parties' mutual intention. If the court determines that the contract is reasonably susceptible of an interpretation supported by extrinsic evidence, the court must admit that evidence for purposes of interpreting the contract. [Citation.] *A court cannot determine based on only the four corners of a document, without provisionally considering any extrinsic evidence offered by the parties, that the meaning of the document is clear and unambiguous.*" (*Fremont, supra,* 148 Cal.App.4th at p. 114, italics added.) "*For a court to take judicial notice of the meaning of a document submitted by a demurring party based on the document alone, without allowing the parties an opportunity to present extrinsic evidence of the meaning of the document, would be improper.*" (*Id.* at pp. 114–115, italics added.) "*In short, a court cannot by means of judicial notice convert a demurrer into an incomplete evidentiary hearing in which the demurring party can present documentary evidence and the opposing party is bound by what that evidence appears to show.*" (*Id.* at p. 115, italics added.) A "hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable." (*Id.* at p. 114; *Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374.)

In *Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807 (*Southern Pacific*), the plaintiff lessee sought declaratory relief, breach of contract damages, and related relief in connection with an oil and gas lease alleging defendant

lessors wrongfully claimed the lease had terminated.  (*Id.* at p. 812.)  The plaintiff lessee had attached the lease to its complaint, and the defendant lessors demurred, arguing the lease had terminated according to its terms.  (*Id.* at pp. 812, 815.)  The trial court sustained the demurrer without leave to amend.  (*Id.* at p. 815.)

In reversing the order, the *Southern Pacific* court wrote, "The trial court … necessarily concluded that taking the lease within its four corners it had a plain meaning and that it would be inappropriate to receive extrinsic evidence regarding the purpose and effect of the lease, the custom and usage in the oil and gas industry, the practical construction the parties had given the lease and the sense in which the parties had used the words.  This was error." (*Southern Pacific, supra*, 188 Cal.App.3d at p. 815.)  " 'Because the demurrer tests the pleading alone, and not the evidence or other extrinsic matters, it lies only where the defects appear on the face of the pleading. Objections which do not so appear are raised by the answer.' [Citation.]  [¶]  Further, *there is no waiver by failure to plead what extrinsic evidence will be offered.  Where an ambiguous contract is attached and incorporated into the complaint, the party pleading is only required to allege in a complaint the meaning which the party ascribes to that contract*." (*Id.* at p. 817, italics added.)  The court concluded, "[T]he trial court should not have ruled on the lease provisions on the assumption that the plain meaning of the words and provisions in the lease prevails." (*Ibid.*)

*Fremont* and *Southern Pacific* are consonant with California Supreme Court case law and other case law.  In *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 (*PG&E*), the trial court determined that the plain language of a contractual indemnity provision gave a plain meaning to the contract and, based thereon, "refused to admit any extrinsic evidence that would contradict its interpretation." (*Id.* at p. 36.)  In criticizing the trial court's process, our high court wrote:  "When the court interprets a contract on this basis, it determines the meaning of the instrument in accordance with the '… extrinsic evidence of the judge's own linguistic education and

22.

experience.' [Citation.] The exclusion of testimony that might contradict the linguistic background of the judge reflects a judicial belief in the possibility of perfect verbal expression. [Citation.] This belief is a remnant of a primitive faith in the inherent potency and inherent meaning of words." (*Id.* at pp. 36–37, fn. omitted.) "A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." (*Id.* at p. 37.)

Noting that the purpose of contract interpretation is to give effect to the parties' mutual intent, the high court wrote, "[T]he meaning of a writing '… can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended." (*PG&E, supra*, 69 Cal.2d at pp. 38–39.) "[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Id.* at pp. 39–40.) "If the court decides, *after considering this evidence*, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for …' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (*Id.* at p. 40, italics added.)

Similarly, in *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, the court wrote, " 'Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. [Citations.] Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. *Even if a contract appears unambiguous on its*

23.

*face, a latent ambiguity may be exposed by extrinsic evidence* which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' " (*Id.* at pp. 1350–1351, italics added.)

The *Wolf* court explained the two-step process for interpreting a contract when the meaning is in dispute: " ' "First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." ' " (*Wolf v. Superior Court, supra*, 114 Cal.App.4th at p. 1351, quoting *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)

Although the RFP is titled "Request for Proposal for Integrated Waste Management Services" (some capitalization omitted), it uses the alternative terms "bidder" and "proposer" to refer to an RFP responder. It also uses the alternative terms "bid" and "proposal" to refer to the RFP response. Caglia argues the repeated use of the word "bid" in the RFP suggests a competitive bidding process was initiated. City defendants contend the terms "proposal" and "bid" are synonymous and that "use of the interchangeable term[s] … does not create any ambiguity."[18]

The RFP also provides, "Price will be an important criterion, but [] City reserves the right to select a service provider that presents the best qualifications but not necessarily at the lowest price," and that RFP responses will be evaluated "with priority given to pricing." City defendants argue this language "is absolutely inconsistent and irreconcilable with the … notion … that [City] solicited competitive bids and is required

---

[18]     City does not provide a proper citation for its contention the terms are synonymous. If they are synonymous, however, the contention cuts both ways—i.e., the use of the term "proposal" could refer to a "bid" just as a "bid" could refer to a "proposal."

to award the [waste management] contract to the lowest responsible bidder."  Caglia argues the facts that the RFP gave priority to pricing and required the pricing be submitted in sealed envelopes suggests a competitive bidding process within the meaning of Municipal Code section 8-1-11 was initiated.

Where, as here, the parties dispute the meaning of a term or provision, the parties are entitled to provisionally offer extrinsic evidence to support their contention that the term or provision is ambiguous.  (*PG&E, supra*, 69 Cal.2d at pp. 36–37; *Fremont, supra*, 148 Cal.App.4th at p. 114.)  The demurrer process is not designed to allow additional evidence beyond the factual allegations of the complaint or petition and matters that are judicially noticeable.  (§ 430.30, subd. (a).)

Whether extrinsic evidence supportive of Caglia's interpretation of the RFP exists is not known to this court and, it appears, was not known to the trial court.  Caglia has stated that the trial court made its rulings without the benefit of a certified administrative record.  Respondents have not disputed this statement, and, based on our review of the register of actions, we have no reason to doubt it.  While it is true Caglia has not identified any extrinsic evidence in the administrative record that it expects will bear upon the proper interpretation of the RFP, Caglia was not obligated to do so on demurrer. (*Southern Pacific, supra*, 188 Cal.App.3d at p. 817 ["[T]here is no waiver by failure to plead what extrinsic evidence will be offered.  Where an ambiguous contract is attached and incorporated into the complaint, the party pleading is only required to allege in a complaint the meaning which the party ascribes to that contract."].)

*2. Additional Grounds for Demurrer to Caglia's First Cause of Action Are Without Merit*

Respondents also based their demurrers on the contention that Caglia was not the "lowest responsible bidder" that responded to the RFP.  Specifically, they acknowledged Caglia's residential rates were lower than Mid-Valley's residential rates but contended Mid-Valley's commercial and industrial rates were lower than Caglia's corresponding

25.

rates.[19]  We do not believe the point can be established on demurrer.  The FAP alleges Caglia was the lowest responsible bidder and includes the alleged scoring sheets used by City Council members in evaluating Caglia's response to the RFP.  Each City Council member rated Caglia's proposed rates as better than the proposed rates of Mid-Valley.  These scoresheets, while not definitive, support Caglia's allegation that Caglia had the lowest proposed rates.  To the extent respondents contend Mid-Valley's proposed commercial and industrial rates were lower than Caglia's corresponding rates, or that Caglia subsidized the proposed rates for residential customers by charging higher rates for commercial customers, respondents have not pointed to any allegations of the FAP or judicially noticeable facts that support the contention, and we are unaware of any such support.

City defendants also demurred on the ground Caglia's proposed rates violate article XIII D, section 6 of the California Constitution.  The gist of their argument is that proposed rates for waste management services are a type of local property tax, such tax cannot "exceed the proportional cost of the service attributable to the parcel" (Cal. Const., art. XIII D, § 6, subd. (b)(3)), and Caglia's proposed rates do just that.  They base their contention on the following FAP allegation:  "[City defendants] noted [Caglia's] residential service rates were approximately five percent lower than the competition, and asked why [Caglia's] commercial rates were not also five percent lower than the competition.  In response, [Caglia's] representative explained [Caglia's] goal is to provide the best service possible with lowest rates residential rates possible to help working citizens.  [Caglia's] approach passes benefits of lower service costs to residential users based on more strict commercial pricing."  Assuming without deciding that Proposition 218 applies, we cannot interpret the above statements as a definitive

---

[19]     No party contended on demurrer that Caglia was not "responsible" within the meaning of the phrase "lowest responsible bidder.

admission that Caglia's proposed rates "exceed the proportional cost of the service attributable to [any given] parcel." (Cal. Const., art. XIII D, § 6, subd. (b)(3).)

Based on the foregoing, we reverse the trial court's ruling on the demurrer to first cause of action in the FAP, and we need not consider whether leave to amend should have been granted.[20]

### C. Caglia's Second Cause of Action in the FAP—Writ of Mandate Based on Alleged Violation of Substantive Due Process

Because Caglia amended its second cause of action for a writ of mandate, we will address that claim in connection with Caglia's appeal of the August 2024 Order sustaining respondents' demurrers to the SAP. (See *post*, pt. III.)

### D. Caglia's Third Cause of Action in the FAP—Declaratory Relief

In sustaining the demurrers to Caglia's third cause of action for declaratory relief, the trial court commented that the third and fourth causes of action "are simply Prayers for Relief." The court then compared Caglia's actual prayer for relief as to Caglia's first cause of action for a writ of mandate against Caglia's declaratory relief cause of action,

---

**20** Caglia argues on appeal that the case *Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209 (*Eel River*) is virtually identical to the case at bar. We agree there are similarities in the two cases but also note there are differences that distinguish *Eel River* from this case.

By way of example only, in *Eel River*, unlike the instant case, "the parties agree[d] that the [Humbolt County] Board [of Supervisors] intended to use and employed a process that constitutes 'competitive bidding' "—an issue that is hotly disputed in the present case. (*Eel River, supra*, 221 Cal.App.4th at p. 229.) The primary question at issue in *Eel River* was whether the competitive bidding process also included a "lowest *responsible* bidder" requirement —i.e., whether the lowest bidder must also be determined to be a responsible, or qualified bidder, in order to secure a waste management contract—an issue not in dispute here. (*Id.*, at p. 214.)

We acknowledge there are similarities in the contract award processes employed in *Eel River* and in the case at bar. By way of example only, in *Eel River*, the Board of Supervisors authorized the use of sealed bids and used weighted criteria to evaluate bids similar to some of the weighted criteria utilized by City in this case to evaluate the bids or proposals. (*Eel River, supra*, 221 Cal.App.4th at p. 216.)

In any event, we need not rely on *Eel River* to support our decision in this matter.

presumably to demonstrate the similarity between the two causes of action and the relief sought.

On appeal, Caglia contends the trial court erred by concluding that the third cause of action in the FAP for declaratory relief is "simply [a] Prayer[] for Relief." Caglia states that this cause of action sought "the resolution of actual, active controversies between the Parties, including, but not limited to: (1) the responsiveness of [Mid-Valley's] bid; (2) [Caglia's] status as the lowest responsible bidder; (3) whether [Municipal Code] section 8-1-11's terms require[s] the selection of the lowest responsible bidder …; and (4) the scope of [] City's authority and/or discretion regarding whether to select the lowest responsible bidder …." Caglia also contends the latter two issues are "at risk of repetition if the RFP process restarts following this action or is otherwise rebid in the future."

In response, Mid-Valley contends declaratory relief is unavailable because Caglia "seeks solely to address perceived past wrongs, decisions made by [] City in awarding the project to [Mid-Valley], whether [Mid-Valley's] proposal complied with the RFP and the [Municipal Code], [and] [] City's exercise of discretion/duties in awarding the [waste management contract] to [Mid-Valley] and asked the Trial Court to rescind the award to [Mid-Valley] and award the contract to [Caglia]." City similarly contends, "There is no basis for declaratory relief when only past wrongs are involved." City argues that once a cause of action for an alleged wrongful act has accrued—as has been alleged here—declaratory relief is not an appropriate vehicle to remedy the alleged wrong. We agree with respondents.

" 'Declaratory relief operates prospectively, serving to set controversies at rest. If there is a controversy that calls for a declaration of rights, it is no objection that past wrongs are also to be redressed; *but there is no basis for declaratory relief where only past wrongs are involved. Hence, where there is an accrued cause of action for an actual breach of contract or other wrongful act, declaratory relief may be denied.*' " (*Osseous*

*Technologies of America, Inc. v. DiscoveryOrtho Partners LLC* (2010) 191 Cal.App.4th 357, 366, italics added (*Osseous*), quoting 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 869, p. 284; accord, *California Union Ins. Co. v. Trinity River Land Co.* (1980) 105 Cal.App.3d 104, 110.)

In *Osseous*, the court wrote, " ' " 'The purpose of a declaratory judgment is to "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation." ' [Citation.] 'Another purpose is to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation.' " ' " (*Osseous, supra*, 191 Cal.App.4th at p. 364; accord, *In re Claudia E.* (2008) 163 Cal.App.4th 627, 633.) " ' " 'One test of the right to institute proceedings for declaratory judgment is the necessity of present adjudication *as a guide for plaintiff's future conduct in order to preserve his legal rights*.' " ' " (*Osseous*, at pp. 364–365, italics added.)

In *Orloff v. Metropolitan Trust Co.* (1941) 17 Cal.2d 484, the plaintiff sued for breach of an escrow agreement and related "causes of action for civil conspiracy, for money received in trust for appellant, for money had and received, and for declaratory relief." (*Id.* at p. 486.) The plaintiff alleged (1) he was the assignee of an intended third party beneficiary to the escrow agreement, (2) he had a right to receive certain sums deposited into the escrow, and (3) the funds were distributed to others instead of him after which, the escrow closed. (*Id.* at pp. 486–487.) Our high court upheld an order sustaining a demurrer to the declaratory relief cause of action, writing: "The appellant alleges that a controversy exists between him and the defendants as to their respective rights and obligations under the agreements which have been particularly pleaded. But all of the acts of which he complains were concluded before his suit was commenced and the relief he seeks is for the court to review them and declare that he is entitled to a judgment for $2,500. These allegations do not measure up to the requirements of an

action for declaratory relief, and the superior court properly refused to exercise its power to entertain the complaint upon that count." (*Id.* at p. 489.)

"A controversy is ripe when it has reached, but has not passed, the point that the facts sufficiently have congealed to permit the court to issue a useful decision. [Citation.] The purpose of the declaration is to allow the parties to shape their conduct to avoid a breach. [Citation.] There is no basis for declaratory relief where only past wrongs are involved." (*Cordoba Corp. v. City of Industry* (2023) 87 Cal.App.5th 145, 157.) "The purpose of a judicial declaration of rights in advance of an actual tortious incident is to enable the parties to shape their conduct so as to avoid a breach. '[D]eclaratory procedure operates prospectively, and not merely for the redress of past wrongs. It serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs; in short, the remedy is to be used in the interests of preventive justice, to declare rights rather than execute them.' " (*Babb v. Superior Court* (1971) 3 Cal.3d 841, 848; accord, *SJJC Aviation Services, LLC v. City of San Jose* (2017) 12 Cal.App.5th 1043, 1062.)

Here, Caglia's declaratory relief cause of action seeks to enforce rights that it alleges have already been violated. It does not seek a judicial declaration in order to prevent the commission of future wrongs, a repudiation of obligations, or an invasion of rights. In short, Caglia's declaratory relief cause of action seeks an adjudication of past wrongs. Declaratory relief is not available for that purpose.

Caglia's assertion that there is a "risk of repetition if the RFP process restarts following this action or is otherwise rebid in the future" is speculative and does not alter our determination. Caglia has not identified any new facts that it could allege to state a proper cause of action for declaratory relief and to obviate the deficiency in the cause of action identified above. Accordingly, we will affirm the May 2024 Order to the extent it sustained the demurrer to the third cause of action in the FAP for declaratory relief.

### III. Appeal of the August 2024 Order

#### A. *Caglia's First Cause of Action in the SAP—Writ of Mandate Based on Alleged Violation of Substantive Due Process*

On appeal, Caglia contends the trial court erred in sustaining the demurrers to its substantive due process claim. Caglia argues the court "incorrectly focused on the Councilmembers' individual conduct and statements rather than the cumulative impact of [alleged] procedural errors" in evaluating the claim. Caglia contends City defendants, in awarding Mid-Valley the waste management contract, "deviated from established rules"; "employed unfair subjective criteria"; "took inconsistent positions regarding the applicability of Proposition 218 to [the] process"; and "failed to provide fair hearings." Caglia also contends two City Council members admitted personal bias in making their decision and one City Council member threatened another member to influence her vote. Caglia argues the cumulative impact of this conduct was to deny it substantive due process and that, at a minimum, it should have been granted leave to further amend the cause of action.

Mid-Valley contends Caglia "did not, as a matter of law, show any conduct that was taken for the purpose of oppression, that amounts to an abuse of governmental power that shocks the conscience, or was legally irrational in that it is not sufficiently keyed to any legitimate state interest," which it argues is required under case law. City makes a similar argument, contending City's award of a waste management contract is a legislative action and City Council members are not subject to disqualification for bias when undertaking such action. We agree with respondents that the allegations of the SAP do not state a substantive due process claim.

"Substantive due process protects against arbitrary government action. [Citation.] A substantive due process violation requires more than 'ordinary government error,' and the ' " 'arbitrary and capricious' " ' standard applicable in other contexts is a lower threshold than that required to establish a substantive due process violation. [Citation.]

31.

A substantive due process violation requires some form of outrageous or egregious conduct constituting 'a true abuse of power.' " (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855–856.)

" ' "The doctrine of substantive due process 'does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents "governmental power from being used for purposes of oppression," or "abuse of governmental power that shocks the conscience," or "action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." ' " ' " (*Las Lomas Land Co., LLC v. City of Los Angeles, supra*, 177 Cal.App.4th at p. 856; accord, *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 709–710; see *Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 184.)  In considering this latter consideration, i.e., the legal rationality of governmental action, the motives of those voting in favor of the action are irrelevant.  (See *Breneric Associates*, at pp. 184–185.)

On appeal, Caglia points to allegations in its SAP that two City Council members "select[ed] Mid-Valley for perceived personal cost savings and/or regulatory compliance support" and that they "admitted personal biases regarding the [waste management contract] award by specifically highlighting their personal business ventures as restaurant owners and their need for commercial support."  (Boldface & underlining omitted.)  To elaborate, Caglia alleges, on information and belief, that two voting members of City Council were "motivated by [their] personal bias in favor of Mid-Valley and/or [their] personal financial interests in perceived costs savings to be realized by [their] restaurant[s], … not those financial interests of the residents of [] City as a whole." (Boldface & underlining omitted.)  Caglia also alleges, on information and belief, that one of those voting members "was motivated by her separate biases and financial concerns stemming from [another voting member's] private efforts in favor of Mid-Valley and his threats to coordinate a boycott of her restaurant."  (Boldface & underlining

32.

omitted.)[21]  The foregoing allegations are not actual facts.  They are " ' " 'contentions, deductions or conclusions of fact' " ' " and are not considered on demurrer.  (*Committee for Sound Water & Land Development v. City of Seaside, supra*, 79 Cal.App.5th at p. 399.)

Caglia also points to allegations in the SAP that one of the two City Council members referenced above "commented on owning a restaurant and indicated that interest was playing a part in his decision in light of looming Senate Bill 1383 compliance required in 2024"; the other referenced City Council member "echoed these sentiments as another restaurant owner in [] City"; voting members "commented on the importance of ensuring compliance with [Senate Bill] 1383 in the commercial space beginning January 1, 2024, as a reason supporting immediate action on the [waste management contract]; and one City Council member "pushed for immediate award of the [waste management] contract to Mid-Valley after [a third voting member] highlighted perceived risks to restaurant owners caused by any City delay in [Senate Bill] 1383 compliance efforts."

The above allegations do not rise to the level necessary to demonstrate outrageous or egregious conduct, or a true abuse of power that shocks the conscience.  Notably, the RFP itself repeatedly refers to Senate Bill 1383—for example, and without limitation: There is a need to collect, process and divert waste "in a manner that is compliant with … all relevant [Senate Bill] 1383 regulations" (a requirement that is repeated in the RFP); proposers/bidders "should be able to demonstrate how their proposed services will satisfy each applicable [Senate Bill] 1383 regulation"; Bids/proposals may utilize "[a] 3-

---

[21]     In addition, Caglia does not allege the actual content of the alleged threats to coordinate a boycott, the information Caglia relied upon for the allegation, or whether the alleged threatened action was actually tied to or conditioned upon the member's vote.  Without more, we do not view this allegation, alone or in concert with the remaining allegations, as outrageous or egregious conduct.  "Urging customers to boycott a store lies at the core of the right to free speech."  (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 869.)

container [Senate Bill] 1383 'standard compliance' approach"; "Preference points may be awarded to firms that commit to using renewable natural gas … that assists [City] in meeting [Senate Bill] 1383 procurement requirements"; City has an interest in "whether the proposing firm can assist [] City in meeting facility capacity requirements in [Senate Bill] 1383 regulations"; "Proposer will be expected to demonstrate a familiarity with all relevant [Senate Bill] 1383 regulations"; "The selected firm will be required to prepare and implement a public education and outreach program … within [Senate Bill] 1383 regulations"; and "The selected firm will be expected to assist [] City with all aspects of [Senate Bill] 1383 compliance related to the collection, processing, and ultimate disposition of organic wastes and other collection programs that may impact [] City's compliance." Additional provisions in the RFP further reflect the importance of Senate Bill 1383 compliance to City's waste management obligations. Consequently, the concern of City Council members regarding Senate Bill 1383 compliance cannot be considered outrageous, egregious, or shocking. Senate Bill 1383 compliance does not only affect the two City Council members that own restaurants. It also affects City at large, including, without limitation, other restaurant owners. Undoubtedly, it is legally rational and tied to a legitimate interest of City.

Caglia's contention that City defendants "took inconsistent positions regarding the applicability of Proposition 218 to this process" is unsupported by the allegations of the SAP and the referenced SAP attachments. Caglia does not explain how City's position in that regard was inconsistent and does not explain how such an allegation, if one had been made, supports its claim.

Ultimately, Caglia's claim that City denied it a fair hearing is premised on the above contentions and allegations. We have reviewed the allegations of the SAP and conclude they do not, singularly or cumulatively, rise to the level of a substantive due process violation. Accordingly, we will affirm the May and August 2024 Orders to the extent they sustained demurrers to Caglia's substantive due process claim.

***B.*** ***Further Leave to Amend the Substantive Due Process Cause of Action Was Not Required***

Caglia argues the trial court should have granted Caglia further leave to amend the SAP.  Mid-Valley contends the trial court was not required to grant Caglia further leave to amend because Caglia never proffered additional facts to demonstrate it could successfully amend the claim to state a cause of action.  We agree with Mid-Valley.

"The plaintiff has the burden of proving that an amendment would cure the defect."  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  " 'The plaintiff's "burden of demonstrating a reasonable possibility to cure any defect" [citation] is not pro forma. " 'To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.]  ...  The plaintiff must clearly and specifically set forth ... factual allegations that sufficiently state all required elements of that cause of action.  [Citations.]  Allegations must be factual and specific, not vague or conclusionary.' " ' " (*Baldwin v. AAA Northern California, Nevada & Utah Ins. Exchange* (2016) 1 Cal.App.5th 545, 559.)

In support of its argument, Caglia cites section 472 in support of its claim that it should have been granted further leave to amend after the trial court sustained the demurrers to the SAP.  Section 472, subdivision (a) provides:  "A party may amend its pleading once without leave of the court at any time before the answer, demurrer, or motion to strike is filed, or after a demurrer or motion to strike is filed but before the demurrer or motion to strike is heard if the amended pleading is filed and served no later than the date for filing an opposition to the demurrer or motion to strike.  A party may amend the pleading after the date for filing an opposition to the demurrer or motion to strike, upon stipulation by the parties.  The time for responding to an amended pleading shall be computed from the date of service of the amended pleading."

Section 472, subdivision (a) allows a plaintiff or petitioner one opportunity to amend before adverse parties answer or otherwise respond to the complaint or petition. The record shows that Caglia already took advantage of this opportunity. Caglia amended its original petition prior to respondents filing an answer or response. Additionally, nothing in the record demonstrates Caglia attempted to amend either the FAP or SAP prior to hearings on the respective demurrers thereto, or that the parties stipulated to additional amendments. Consequently, section 472 does not aid Caglia.

To further support its contention that the trial court should have granted it leave to amend its substantive due process cause of action, Caglia argues that "ongoing investigations were likely to produce new information relevant to its claims." We likewise reject this argument. "[A] vague suggestion that additional facts might be uncovered through discovery is insufficient to justify allowing … further leave to amend …." (*AREI II cases* (2013) 216 Cal.App.4th 1004, 1020.)

Finally, Caglia contends that if leave to amend were granted, it would allege the following "facts": "(1) a discussion of citizens' dissatisfaction with [Mid-Valley's] level of performance since assuming service in [] City; and (2) the addition of additional service costs to the [waste management contract] after [] City's approval." Item (1) is not a fact, it is merely a subject area and is not a basis for granting leave to amend. Moreover, it relates only to events that followed the award of the waste management contract to Mid-Valley. Caglia does not demonstrate how this would correct deficiencies in its pleading of a substantive due process claim. Similarly, item (2) is nonspecific and appears to relate to alleged conduct that occurred subsequent to the waste management contract award. Again, Caglia does not explain how this would cure deficiencies in its pleading. These additional assertions provide no adequate basis upon which to grant further leave to amend. (See *Baldwin v. AAA Northern California, Nevada & Utah Ins. Exchange, supra*, 1 Cal.App.5th at p. 559.)

### C. Caglia's Second Cause of Action in the SAP—Common Law Bias

Caglia acknowledges that "leave to amend does not generally provide leave to amend to add new causes of action" but contends the rule is " 'inapplicable' where 'the new cause of action directly responds to the court's reason for sustaining the earlier demurrer,' " quoting *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1015 (*Patrick*).

In *Patrick*, the plaintiff attempted to state shareholder derivative claims on behalf of a corporation and against the corporate directors. (*Patrick, supra*, 167 Cal.App.4th at pp. 999, 1015.) The trial court sustained a demurrer to the plaintiffs' second amended complaint on grounds the "plaintiff failed to allege she had standing as a beneficial shareholder" of the corporation. (*Id.* at pp. 1013, 1015.) The demurrer was sustained with leave to amend. (*Id.* at p. 1015.) In response, the plaintiff added a declaratory relief cause of action which sought to declare that she had a community property interest in the corporation—i.e., a beneficial shareholder. (*Id.* at pp. 1002, 1015.) The defendants again demurred, and the trial court sustained the demurrer without leave to amend. (*Id.* at p. 1002.) The plaintiff appealed. (*Id.* at p. 999.)

In defending the trial court's order, defendants argued the plaintiff was granted "leave to amend only the causes of action asserted in the prior complaint, not leave to add entirely new causes of action." (*Patrick, supra*, 167 Cal.App.4th at p. 1015, italics omitted.) The *Patrick* court acknowledged the general rule that " 'granting … leave to amend [in an order sustaining a demurrer] must be construed as permission to the pleader to amend the cause of action which he pleaded in the pleading to which the demurrer has been sustained.' " (*Ibid.*, quoting *People ex rel. Dept. Pub. Wks. v. Clausen* (1967) 248 Cal.App.2d 770, 785.) However, it concluded the trial court should have permitted the newly added declaratory relief cause of action because it "directly responds to the court's reason for sustaining the earlier demurrer" and was "the cause of action by which [the] plaintiff may prove her standing." (*Patrick*, at p. 1015.)

The situation here differs from that in *Patrick*.  In sustaining the demurrer to the FAP's substantive due process cause of action, the trial court wrote:  "[O]n this … Cause of Action the demurrer is sustained, but with leave to amend so [Caglia] can more clearly identify the nexus between the comments made by Council Members and the alleged due process violations."  We have already determined that Caglia failed to allege in its SAP sufficient facts to state a cause of action for violation of substantive due process.  Having failed to do so, Caglia was not entitled to use these deficient allegations in an attempt to support a different cause of action.  Consequently, we find no error in the court disallowing Caglia's new cause of action.

## DISPOSITION

We dismiss the appeal of the TRO/OSC Order (i.e., the March 1, 2024, "Order After Hearing re Request for Temporary Restraining Order and Preliminary Injunction" [boldface & some capitalization omitted] and the February 28, 2024 minute order to the same effect) on grounds the issue is moot.

We reverse the May 2024 Order (i.e., the May 20, 2024 "Decision Sustaining All Respondent/Defendant's and Real Parties in Interest Demurrers With Leave to Amend on the Second Cause of Action Only") to the extent it sustained demurrers to Caglia's first cause of action in the FAP for a writ of mandate based on allegations City failed to proceed in the manner requested by law, and we otherwise affirm the order.  We affirm the August 2024 Order (i.e., the August 21, 2024 "Order After Hearing Granting City of Selma, City Council of the City of Selma, and Real-Party-In-Interest Mid-Valley Disposal LLC's Demurrer to Plaintiff's Second Amended Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief" [boldface & some

capitalization omitted] and the July 24, 2024 minute order to the same effect) sustaining demurrers to Caglia's SAP in its entirety.[22]

We remand the case to the superior court for further proceedings not inconsistent with this opinion. In the interests of justice, each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


                                                                          HILL, P. J.
WE CONCUR:


FRANSON, J.


PEÑA, J.


---

[22] Although we deemed the August 2024 Order as including a judgment of dismissal so as to allow this court to entertain this appeal, we clarify that our affirmance of the August 2024 Order is not intended to, and does not, affirm dismissal of the litigation.